965 A.2d 174 (2009)
405 N.J. Super. 418
NEW JERSEY DIVISION OF YOUTH AND FAMILY SERVICES, Plaintiff-Appellant,
v.
A.R., Defendant-Respondent.
In the Matter of the Guardianship of C.S., Jr., a minor.
DOCKET NO. A-5079-07T4.
Superior Court of New Jersey, Appellate Division.
Argued January 22, 2009.
Decided March 4, 2009.
*177 Ann Avram Huber, Deputy Attorney General, argued the cause for appellant (Anne Milgram, Attorney General, attorney; Andrea M. Silkowitz, Assistant Attorney General, of counsel; Ms. Huber, on the brief).
Sarah L. Monaghan, Designated Counsel, argued the cause for respondent A.R. (Yvonne Smith Segars, Public Defender, attorney; Ms. Monaghan, on the brief).
Christopher A. Huling, Assistant Deputy Public Defender, argued the cause for minor C.S., Jr. (Yvonne Smith Segars, Public Defender, Law Guardian, attorney; Mr. Huling, on the brief).
Before Judges STERN, WAUGH and NEWMAN.
The opinion of the court was delivered by
STERN, P.J.A.D.
The Division of Youth and Family Services ("DYFS") appeals from a "judgment of guardianship after trial" which terminates the parental rights of fathers M.M. and C.S. to their respective children, but denies the termination of parental rights of the mother, A.R. DYFS also appeals from the denial of a motion for reconsideration and to supplement the record.
A.R. is the mother of four minor children, including C.S., Jr. ("Junior") who was born June 28, 2006. His sister and half-sisters are three to nine years older. A.R. is married to C.S., the father of Junior and Gwen.[1] There is no contest to the judgment terminating the parental rights of the fathers, including C.S. While the Family Part declined to terminate A.R.'s rights to any of her four children, DYFS appeals only from that portion of the judgment regarding A.R.'s parental rights over Junior, her youngest child.

*178 I.
On September 20, 2005, DYFS removed A.R.'s three children from the home of A.R. and C.S. Two days later the Family Part found that "the removal ... was required due to imminent danger" because of the parents' drug use and C.S.'s incarceration. Legal and physical custody was transferred to DYFS.
On April 5, 2006, the trial court entered a "multipurpose order" allowing for reunification of the three children with A.R. once she provided "a permanent plan of how a single mother would care for her children" and verification that C.S. "has moved out" of the home. Reunification occurred on July 25, 2006.
The court ordered the removal of the children again on September 6, 2006. A.R. was found to have allowed C.S. "to return to the home and be with the children while he was actively using drugs." By that time, Junior had been born and all four children were removed and placed in the "immediate care and supervision of" DYFS. However, on November 8, 2006, the court ordered reunification, and legal and physical custody were returned to A.R. Shortly thereafter, on December 12, 2006, the children were again removed from the home because C.S. was found in the house, high on crack cocaine. The emergency removal was confirmed by an order entered on December 14, 2006. The children were again placed "under the care and supervision" of DYFS, and a Law Guardian was appointed.
DYFS filed a complaint for guardianship and an order to show cause on May 8, 2007. At a hearing on December 17, 2007, the Family Part ordered that the trial commence on January 7, 2008, and that "[A.R.] shall attend a bonding evaluation to be scheduled by [DYFS]" in advance thereof. However, this evaluation never took place.
The trial occurred in January and February, 2008. In a comprehensive opinion, Judge Mark J. Nelson denied the termination and guardianship with respect to A.R. The court reinstated the protective services litigation and listed the matter for a compliance review on May 28, 2008. Judge Nelson found that DYFS satisfied its burden on only two of the four prongs of the statutory test required for termination. See N.J.S.A. 30:4C-15.1. He concluded as follows:
II.
[Substantial portions of the opinion have been redacted for purposes of publication at the request of the court.]
The Division should be proud of its conduct and actions in this matter and not be pessimistic. The Division has, in fact, fulfilled its obligations and duties in this matter. We have a very troubled family. The Division provided services and as stated made more than reasonable efforts to provide those services. The defendant, [A.R.], accepted and complied with those services. The statute requires that the Division make reasonable efforts so that defendants can comply with the services. That is what occurred in this case in regard to [A.R.] and rather than stating that this case might be a failure, the Division should feel proud that this case is a success in its providing services and the defendant [A.R.] accepting and complying with services. Unfortunately, that cannot be stated in regards to the defendants [C.S.] and [M.M.].
Dr. Daniel Bromberg, a clinical psychologist, performed bonding evaluations on A.R. and her children on April 19, 2007, and evaluated A.R. and C.S. individually. Dr. Bromberg also conducted a bonding evaluation of Junior with his foster parents. *179 Based on these evaluations, Dr. Bromberg determined that A.R. is unable to provide a safe and stable home for her children. He based this conclusion on her "long standing history of substance abuse," her history with men who have substance abuse problems, and her failure to protect herself and her children from domestic violence. He also noted that A.R.'s employment history "didn't appear to be particularly stable" and her marketable skills were severely limited.
Dr. Bromberg stated that A.R. only attended Narcotics Anonymous ("N.A.") meetings "once in a blue moon," which concerned him. He was also disturbed to learn that the father of the older girls, Darlene and Barbara, A.R.'s former paramour M.M., had been accused as a teenager of raping his younger sister, but A.R. did nothing when she heard this accusation and "stayed with him." Dr. Bromberg believed this behavior was part of "a pattern of failure to be aware of significant risks to her children and failure to protect her children from those significant risks." He also noted that psychological tests revealed A.R. was "skilled in deceiving other individuals" and was "preoccupied with approval." Dr. Bromberg attributed A.R.'s concealing her substance abuse history from him during her evaluations to this desire for approval.
In sum, Dr. Bromberg determined that A.R. was "unable to parent at the time of the evaluation." He stated that A.R. needed to be able to demonstrate to the court that she could provide safe, stable housing, keep up with her rent payments, hold a job, and remain clean and sober. He also opined that she needed psychotherapy, which would not be "short term."
Regarding A.R.'s bonds with her children, Dr. Bromberg noted that all four children had "different levels of emotional attachment to her." In describing A.R.'s bond with Junior, Dr. Bromberg acknowledged that any analysis he could provide was limited because Junior slept through most of the evaluation. As such, "[i]t was easier to assess the bond [A.R.] had to [Junior], then [sic] it was to assess the bond that [Junior], has to [A.R.]" However, Dr. Bromberg observed that, while Junior was awake, he "appeared to interact with his mother well, he was cuddling with his mother. There was mutual gazing between them." Dr. Bromberg stated that because Junior "slept through a great deal of the bonding evaluation" with A.R., the impact of termination was a "more difficult question to answer."
When asked if Junior would suffer any harm if his ties to A.R. were permanently severed, Dr. Bromberg stated "I believe that he would, certainly, miss [A.R.], ... given his age, and the amount of time that he's been in foster care, at this point, and the nature of the relationship with the foster parents. I'm not convinced that that would be terribly harmful for him." He acknowledged that Junior would suffer "some harm" but stated that "with psychotherapy and with appropriate support" he could recover. He also stated that, while terminating A.R.'s parental rights would not create severe or enduring harm, another failed reunification would be "devastating" to the other children.
Dr. Albert Griffith, a clinical psychologist, performed an evaluation of A.R. on June 10, 2007, and testified for the defense. He also conducted bonding evaluations on A.R. and her three oldest children.
In his evaluation of A.R., Dr. Griffith testified that, based on her performance on the Adult Intelligence Scale reading, it was likely A.R. had a learning disability. However, he found that she had "sufficient general abilities to learn parenting." In assessing A.R.'s parenting skills, Dr. Griffith *180 found that she maintained her visits with her children, that she was "able to adequately describe her children" and "could talk about their individual needs." However, Dr. Griffith noted that "she was not that aware of [Junior], simply because he had been removed so much earlier."
Dr. Griffith also testified that A.R. needed parenting skills training, but was not "grossly deficient at this point." He "saw reunification as being possible, say, placed in two stages with a period of adjustment between the 2 of about 60 days." Dr. Griffith noted that A.R. should continue to be drug tested.
Dr. Griffith did not perform any evaluations of Junior and, therefore, could give "no opinion" regarding the child or his situation. He stated that because Junior was under the age of two, an evaluation would not be "appropriate" based on psychological literature that "suggests that children of that age really don't bond." However, later in his testimony Dr. Griffith stated "the crucial stages [of bonding], basically, begin ... when the child is born and cared for in infancy."
In addressing the risk that future reunifications may fail as the attempts in November and December of 2006 had, Dr. Griffith stated that a repeated failure would not "necessarily" occur because A.R. was in a "better stage in her recovery process." When asked if being reunited with her four children would be "overwhelming" for A.R., Dr. Griffith acknowledged that she would "feel challenged," but that "there's no reason to believe that this woman cannot cope with four children" and simultaneously "tak[e] care of the other issues that she needs to do."
Dr. Jeffrey Singer, a clinical psychologist, evaluated A.R. individually on behalf of the Law Guardian, and performed bonding assessments on her and her daughters. In evaluating A.R., Dr. J. Singer[2] found that she had abused crack cocaine, and her behavior was "consistent with a woman who would be in an abusive relationship, that had certain vulnerabilities and she couldn't set appropriate limits with her former husband."[3] He opined that, while A.R. had accomplished "no small feat" in staying off drugs, she would need "ongoing support" to avoid getting involved with abusive men. However, he also found "she enjoys being a mother very much and has the capacity to function in that role of support."
When asked if A.R. was capable of protecting and parenting her four children on a day to day basis, Dr. J. Singer stated that she could, "with the correct combination ofof therapeutic services." These services include day care and having an "aid" who "comes in and helps around thethe house." Despite these challenges, Dr. J. Singer testified on cross-examination that he thought A.R. would succeed, given "her love, her commitment, and her motivation."
When questioned about the effects of another failed reunification on the children, Dr. J. Singer stated that he did not know if the harm would be "enduring," but he acknowledged that it would "be upsetting and traumatic. Probably at the lower end of severe, but it's hard to know exactly how much more these kids can take." While Dr. J. Singer performed no bonding evaluation with Junior, he did testify that Junior's sisters discussed him during their bonding evaluations, knew that he was *181 their "little brother," and were generally "inclusive of him in the family."
On December 10 and 11, 2007, Dr. Mark Singer performed bonding evaluations of the girls with their foster mother and of Junior with his foster parents. He also testified for DYFS. With regard to Junior's bond with his foster parents, Dr. M. Singer found that Junior "clearly exhibited many of the indicators suggesting a secure attachment between himself and his ... foster parents." He noted that Junior interacted well with his foster parents, with "a lot of verbal contact, lot of smiling, lot of laughing." Also, Junior would not stay in the room with Dr. M. Singer when his foster parents left and "sought out his caretakers."
When asked if Junior would experience harm if the court severed his relationship with his foster parents, Dr. M. Singer responded "that the child would experience both significant and enduring harm." Because his foster parents "are his central parental figures," Dr. M. Singer believed that Junior would experience "a lot of emotional and behavioral regression" in the short term and a "feeling of insecurity, a feeling of low self esteem, feelings of sadness" in the long term. Dr. M. Singer also noted that Junior "is at an age where... the window of opportunity to form healthy child/parental attachments closes after a period of time."
Dr. M. Singer could not testify to Junior's bond with A.R., his sister, or his half sisters because he did not conduct any bonding evaluation with A.R. or the girls.
After hearing the testimony and reviewing the documentary evidence, Judge Nelson determined that DYFS had not proven, by clear and convincing evidence, that A.R.'s parental rights should be terminated as to any of her children. He addressed each of the four prongs of the statutory best interest test, N.J.S.A. 30:4C-15.1(a), separately and found that DYFS only established the first and third by sufficient evidence.
Judge Nelson found that DYFS failed to establish the second and fourth prongs. With respect to the second prong, the judge concluded that A.R. had complied with all the services DYFS offered her, complied with substance abuse treatment and had acquired stable employment, recently receiving "promotion to a supervisory position." Moreover, the judge found the testimony of Dr. Bromberg to be "incredible, particularly, in comparison to the testimony of all of the other doctors testifying and, particularly, in comparison to all the steps that [A.R.] has undertaken and completed to provide a safe and stable home."
Because of the girls' ages, they were more bonded and "have a much stronger attachment and relationship to their mother" than does Junior, and were "only somewhat attached to their foster mother," the judge found there was "no testimony that separating the girls from the resource family would cause serious or enduring harm." The judge further noted that because "the Division failed to provide a comparison bonding evaluation with his mother," DYFS could not show that separating Junior from his foster parents would cause serious and enduring emotional or psychological harm.
The judge also concluded that DYFS failed to meet its burden as to the fourth prong. He found that "the three girls have a much stronger and more serious and enduring bond with their natural mother than they do with their foster mother" and that Junior had "a very strong bond with his foster parents which is quite understandable because he spent almost his entire life with his foster parents." However, with respect to Junior, *182 the judge again focused on DYFS's failure to provide a bonding evaluation between him and A.R., and said:
he does have a bond with [A.R.] but no witness could testify that it was a meaningful bond.... The one and only bonding evaluation scheduled between the mother and that child was frankly worthless as [Junior] slept during the session and Dr. Bromberg was unable to gauge the level of attachment or bond between the two.
The judge held that, because it was DYFS's burden to present evidence of that bond, "and to provide evidence to compare and contrast" the bonds Junior had with his foster parents and biological mother, "the Division has failed to demonstrate that termination of parental rights would not do more harm than good as to the child."
Based on his findings, the court dismissed DYFS's complaint to terminate A.R.'s parental rights to her four children. Thereafter, DYFS filed a motion for reconsideration and a motion to supplement the record. It argued that it was unable to provide a bonding evaluation between Junior and A.R. because Junior had slept through the first one and A.R. was not ordered to attend a second bonding evaluation with Junior until December 17, 2007. According to the Deputy Attorney General trying the case, "there wasn't enough time for [Dr. Mark Singer] to do an evaluation and submit a report between December 17th and the time of trial." Judge Nelson denied the motion and held that DYFS was, in effect, arguing that he erred by not considering evidence that the Division never presented. He noted that the correct course of action should have been to ask for an adjournment, not go into trial with inadequate proofs.

III.
On this appeal we must afford great deference to the Family Part's findings of fact and conclusions of law based on those findings. N.J. Div. of Youth & Family Servs. v. G.L., 191 N.J. 596, 605, 926 A.2d 320 (2007); N.J. Div. of Youth & Family Servs. v. M.M., 189 N.J. 261, 279, 914 A.2d 1265 (2007). Accordingly we must "uphold the factual findings undergirding the trial court's decision if they are supported by `adequate, substantial and credible evidence' on the record." M.M., supra, 189 N.J. at 279, 914 A.2d 1265 (quoting In Re Guardianship of J.T., 269 N.J.Super. 172, 188, 634 A.2d 1361 (App. Div.1993)). This is particularly true when findings are based on the "trial court's credibility determinations." Ibid. While our scope of review is expanded "where the focus of the dispute is ... alleged error in the trial judge's evaluation of the underlying facts and the implications to be drawn therefrom," ibid. (internal citations omitted), we must nevertheless "accord deference unless the trial court's findings `went so wide of the mark that a mistake must have been made.'" Ibid. (quoting Snyder Realty, Inc. v. BMW of N. Am., Inc., 233 N.J.Super. 65, 69, 558 A.2d 28, (App.Div.), certif. denied, 117 N.J. 165, 564 A.2d 883 (1989)). See also G.L., supra, 191 N.J. at 605, 926 A.2d 320.
Even though the scope of review remains the same, we also note that in this case the Law Guardian agrees with the trial judge with respect to the denial of termination of A.R.'s parental rights to Junior. While the Law Guardian has an obligation to advocate for the wishes of a child over ten who is able to express his or her own view on the issue, see N.J. Div. of Youth & Family Servs. v. E.P., 196 N.J. 88, 112-14, 952 A.2d 436 (2008), in this case Junior cannot yet speak for himself. In evaluating our scope of review, we find *183 the Law Guardian's position of particular significance because, while she actively represents and speaks for the child, she has to advocate for the best interests of a child too young to speak for himself, and represents neither adversary in the case. Compare R. 5:8A, with Div. of Youth & Family Servs. v. Robert M., 347 N.J.Super. 44, 69, 788 A.2d 888, certif. denied, 174 N.J. 39, 803 A.2d 635 (2002).

IV.
It is well known that a parent's right "to raise a child and maintain a relationship with that child" is constitutionally protected under the federal and state Constitutions. E.P., supra, 196 N.J. at 102, 952 A.2d 436 (citing Stanley v. Illinois, 405 U.S. 645, 651-52, 92 S.Ct. 1208, 1212, 31 L.Ed.2d 551, 558-59 (1972); In re Guardianship of K.H.O., 161 N.J. 337, 346, 736 A.2d 1246 (1999)). As a result, the State's right to terminate parental rights "is limited to situations in which the State has demonstrated that the child's parent or custodian is unfit ... or the child has been neglected or harmed." Matter of Guardianship of J.C., 129 N.J. 1, 10, 608 A.2d 1312 (1992) (citations omitted). "The State has a basic responsibility, as parens patriae, to protect children from serious physical and psychological harm, even from their parents." E.P., supra, 196 N.J. at 102, 952 A.2d 436 (citing K.H.O., supra 161 N.J. at 347, 736 A.2d 1246). However, DYFS has the "heavy" burden of proving, by clear and convincing evidence, that "the natural parent has not cured the initial cause of harm and will continue to cause serious and lasting harm to the child," J.C., supra, 129 N.J. at 10, 608 A.2d 1312, (citing Santosky v. Kramer, 455 U.S. 745, 768, 102 S.Ct. 1388, 1402, 71 L.Ed.2d 599, 616-17 (1982)), and terminating parental rights "is in the best interest of the child." E.P., supra, 196 N.J. at 103, 952 A.2d 436 (citing N.J. Div. of Youth & Family Servs. v. A.W., 103 N.J. 591, 604-12, 512 A.2d 438 (1986)).
N.J.S.A. 30:4C-15.1(a) sets out the four prongs of best interests test, which DYFS must prove by clear and convincing evidence in order to terminate parental rights. "[These] four factors are not `discrete,' but rather `relate to and overlap with one another to provide a comprehensive standard that identifies a child's best interests.'" E.P., supra, 196 N.J. at 103, 952 A.2d 436, (citing K.H.O., supra, 161 N.J. at 348, 736 A.2d 1246). "[T]he focus of the inquiry is not only whether the parent is fit, but also whether he or she can become fit within time to assume the parental role necessary to meet the child's needs." N.J. Div. of Youth & Family Servs. v. R.L., 388 N.J.Super. 81, 87, 906 A.2d 463 (App.Div. 2006), certif. denied, 190 N.J. 257, 919 A.2d 850 (2007) (citing J.C., supra, 129 N.J. at 10, 608 A.2d 1312). Specific evidence is required in each case because the four prongs are extremely fact sensitive. M.M., supra, 189 N.J. at 280, 914 A.2d 1265.
DYFS argues that "[t]he evidence clearly and convincingly showed that ... [A.R.] would be unable to eliminate the risk of harm to ... [Junior] and could not, independently, provide him with a safe and stable home." As noted, Judge Nelson found that DYFS failed to establish two of the four prongs set forth in N.J.S.A. 30:4C-15.1(a). There is no cross-appeal regarding his findings as to the other two prongs.

(1)
The first prong of the best interests of the child standard is whether "[t]he child's safety, health or development has been or will continue to be endangered by the parental relationship." N.J.S.A. *184 30:4C-15.1(a)(1). This requires that "`the harm shown ... must be one that threatens the child's health and will likely have continuing deleterious effects on the child.'" M.M., supra, 189 N.J. at 281, 914 A.2d 1265 (quoting K.H.O., supra, 161 N.J. at 352, 736 A.2d 1246). This prong focuses on "the effect of harms arising from the parent-child relationship over time on the child's health and development." K.H.O., supra, 161 N.J. at 348, 736 A.2d 1246. Stated differently, the parent must have "endangered" the child being terminated.
In his written opinion, Judge Nelson determined that:
[A.R.] ... has harmed all four of the children by engaging in extremely poor judgment that led to three removals of the children. [A.R.] ... has admitted to free basing cocaine, has admitted to a substance abuse issue, ... has exercised poor judgment in her choice of men and has allowed or permitted [C.S.] ... back into the home, has failed to abide by court orders and has neglected the children in general by maintaining a home in an unsanitary condition.
It is uncontested that DYFS satisfied the first prong by clear and convincing evidence. M.M., supra, 189 N.J. at 279, 914 A.2d 1265. A.R. violated a court order on two separate occasions by allowing C.S. into the home. A.R. has abused drugs and generally put her children at risk by failing to maintain a clean and healthy home environment.

(2)
The second prong of the best interests test requires a determination as to whether
[t]he parent is unwilling or unable to eliminate the harm facing the child or is unable or unwilling to provide a safe and stable home for the child and the delay of permanent placement will add to the harm. Such harm may include evidence that separating the child from his resource family parents would cause serious and enduring emotional or psychological harm to the child[.]
[N.J.S.A. 30:4C-15.1(a)(2).]
This prong relates to a parent's unfitness, which may be established by demonstrating a parent is "`unwilling or unable to eliminate the harm' that has endangered the child's health and development." K.H.O., supra, 161 N.J. at 352, 736 A.2d 1246 (quoting N.J.S.A. 30:4C-15.1(a)(2)). Parental unfitness is also established when a parent fails "to provide a `safe and stable home for the child' and a `delay in permanent placement' will further harm the child." Ibid. As already noted, the burden falls on DYFS to demonstrate by clear and convincing evidence that "the natural parent has not cured the initial cause of harm and will continue to cause serious and lasting harm to the child." J.C., supra, 129 N.J. at 10, 608 A.2d 1312 (citing Santosky, supra, 455 U.S. at 763, 102 S.Ct. at 1402, 71 L.Ed.2d at 616-17).
Moreover, "[t]o the extent that the quality of the child's relationship with foster parents may be relevant to termination of the natural parents' status, that relationship must be viewed not in isolation but in a broader context that includes as well the quality of the child's relationship with his or her natural parents." J.C., supra, 129 N.J. at 18, 608 A.2d 1312. "[T]he development of disproportionately stronger ties between a child and foster parents may lead to a bonding relationship the severing of which would cause profound harm...." Ibid. However, it is not enough for DYFS to simply "show that the child has a strong relationship with the foster parents or might be better off if left in their custody...." Id. at 19, 608 A.2d 1312 (citing In re Baby M, 109 N.J. 396, 445, 537 A.2d *185 1227 (1988)). The burden is on DYFS to prove, "by clear and convincing evidence that separating the child from his or her foster parents would cause serious and enduring emotional or psychological harm." J.C., supra, 129 N.J. at 19, 608 A.2d 1312 (citing Santosky, supra, 455 U.S. at 768, 102 S.Ct. at 1402, 71 L.Ed.2d at 616-17). "Such proof should include the testimony of a well qualified expert who has had full opportunity to make a comprehensive, objective, and informed evaluation of the child's relationship with the foster parent." Ibid.
In the present case, the trial judge found that A.R. had eliminated the harm facing Junior and could now provide a safe and stable home for him. The court based this determination on A.R.'s compliance with the services DYFS had provided, except for a brief drug relapse in November 2005. He also noted that she had an apartment, a stable job, and had "proven that she can comply and will comply with [future] services." Concern and efforts by a natural parent after his or her child has been removed from the home, and making genuine and successful efforts to overcome the cause of the removal is of enormous significance. As such, Judge Nelson determined that DYFS failed to satisfy prong two of N.J.S.A. 30:4C-15.1(a)(2).
DYFS argues that the findings are "contrary to the evidence." The Division supports this contention by citing the testimony of the psychological experts during the trial. DYFS notes that Dr. Bromberg concluded that A.R. "continues to present a risk to the children because of her `involvement with men who engage in behaviors that potentially threaten her children's well-being.'" DYFS also notes that Dr. J. Singer expressed concern over A.R.'s choice in men and her "psychological vulnerabilities." He recommended reunification with continued services. However, DYFS asserts that it provided A.R. with those services during her two failed reunification attempts.
As Judge Nelson found, A.R. is currently employed as a manager at McDonald's. She has complied with the services and support DYFS has provided and has completed domestic violence counseling since her children were last removed from her custody. She has filed for divorce from C.S. Dr. J. Singer and Dr. Griffith both testified that A.R. had the ability to succeed if she were given a chance at reunification. While DYFS's expert, Dr. Bromberg, testified she was incapable of parenting with the proper support, Judge Nelson expressly found Dr. Bromberg's testimony was not credible, particularly "in comparison to all the steps that [A.R.] ... has undertaken and completed to provide a safe and stable home" and the work she did following Dr. Bromberg's evaluation. Furthermore, the judge noted "[t]he court never heard Dr. Bromberg indicate that [A.R.] ... was presently unfit to parent her children. Rather, Dr. Bromberg couched his opinion more in terms that it would be `risky' to return the children to [A.R.] ... based on her personal failures and the two prior failed reunifications."
Based on A.R.'s compliance and response to the services provided, Judge Nelson's credibility determination, and the testimony of the other experts, especially with respect to A.R.'s progress, the determination as to the second prong must be upheld based on our scope of review.
DYFS also argues that the evaluations of the other experts, and particularly Dr. Griffith, should be discounted. Its arguments before us sound like a summation for presentation to the trial judge. As we have made clear, and as DYFS acknowledges, we are not the fact finder and cannot consider the matter de novo. There is no attack on the admissibility of the expert *186 testimony; its consistency and its credibility is for the trial court to assess.
DYFS also argues that Junior would experience enduring harm if he is separated from his foster parents, and that the Family Part erred by not giving appropriate weight to that consideration. However, as already noted, the fact that the child has a strong relationship with the foster parents is not by itself enough to terminate parental rights. J.C., supra, 129 N.J. at 18-19, 608 A.2d 1312. See also E.P., supra, 196 N.J. at 109, 952 A.2d 436. It bears repeating that the child's relationship with foster parents "must be viewed not in isolation but in a broader context that includes ... the quality of the child's relationship with his or her natural parents." J.C., supra, 129 N.J. at 18, 608 A.2d 1312.
In noting that Junior "clearly is attached to his resource family," the judge noted that "the Division failed to provide a comparison bonding evaluation with his mother...." As a result the judge determined that DYFS could not show that separating Junior from his foster parents would cause serious and enduring emotional or psychological harm. DYFS contends that, based on Dr. Bromberg's opinion, Junior "would suffer `fairly minimal harm' as a result of the termination of [A.R.]'s parental rights." It also points to the evaluations of all the experts with respect to Junior's bonding with his foster family, and asserts he lived with his mother for only three months, although she did maintain visitation with him. Moreover, and significantly, DYFS asserts that it did not have to provide any proof of Junior's relationship or bond with A.R. While seeking a remand to conduct a bonding evaluation if required,[4] DYFS maintains J.C. does not require a comparative evaluation in this case because of the child's age when removed from his mother's care and because it is asserting the unfitness of the terminated parent as the basis of satisfying the second prong. Stated differently, DYFS asserts that a comparative bonding evaluation is not required when it has demonstrated parental unfitness by clear and convincing evidence.
It is true, as DYFS contends, that J.C. concerned a voluntary placement, and the issue related to the adverse impact of removing children from the foster family with which they bonded. It is also true that J.C. discussed "cases in which DYFS seeks termination of parental rights, not on grounds of current unfitness but because of potential harm to the child based on separation from a foster parent with whom a child has bonded." 129 N.J. at 18, 608 A.2d 1312. Moreover, J.C. expressly held that
[i]n hearing a petition for termination in which the fitness of natural parents is neither relied on nor disputed by the agency, the trial court must also consider parallel proof of the child's relationship with his or her natural parents in assessing the existence, nature, and extent of the harm facing the child.
[Id. at 19, 608 A.2d 1312.]
But J.C. noted that standards for termination of parental rights following voluntary and involuntary placements were the same, and emphasized the need for expert evaluations and testimony with respect to natural and resource families. Id. at 17-19, 608 A.2d 1312.
Despite the specific issue addressed in J.C., Justice Handler developed the relevance and importance of both relationships, *187 as opposed to the "isolation" of that with the foster parents in "assessing the existence, nature and extent of harm facing the child." Id. at 19, 608 A.2d 1312. Hence, we can envision very few scenarios in which comparative evaluations would not be required. Indeed, even when not used to prove harm under the second prong, it is of great significance in evaluating comparative harm under the fourth prong in showing that "`termination of parental rights likely will not do more harm than good,'" E.P., supra, 196 N.J. at 108, 952 A.2d 436 (quoting K.H.O., supra, 161 N.J. at 354-55, 736 A.2d 1246), and in sustaining DYFS's burden of proof. Id. at 103; K.H.O., supra, 161 N.J. at 355, 736 A.2d 1246. Accordingly, we agree that the comparative evaluation was required.
Had the trial judge not made his other findings and conclusions, DYFS's request for a remand to conduct the evaluation might be warranted. See J.C., supra, 129 N.J. at 25-26, 608 A.2d 1312 (remanding for a bonding evaluation). However, here, unlike J.C., other evaluations were performed, and the trial judge did not deem termination to be warranted for additional reasons.

(3)
To satisfy the third prong of the best interests of the child test DYFS must demonstrate that it "has made reasonable efforts to provide services to help the parent correct the circumstances which led to the child's placement outside the home and the court has considered alternatives to termination of parental rights[.]" N.J.S.A. 30:4C-15.1(a)(3). "`Reasonable efforts' may include consultation with the parent, developing a plan for reunification, providing services essential to the realization of the reunification plan, informing the family of the child's progress, and facilitating visitation.'" M.M., supra, 189 N.J. at 281, 914 A.2d 1265, (citing N.J.S.A. 30:4C-15.1(c)). However, DYFS's efforts to provide services "is not measured by their success.... These efforts must be assessed against the standard of adequacy in light of all the circumstances of a given case. Consistent efforts to maintain and support the parent-child bond are central to the court's determination." In re Guardianship of D.M.H., 161 N.J. 365, 393, 736 A.2d 1261 (1999). See also N.J. Div. of Youth & Family Servs. v. F.H., 389 N.J.Super. 576, 620, 914 A.2d 318 (App. Div.), certif. denied, 192 N.J. 68, 926 A.2d 853 (2007).
DYFS has provided substance abuse evaluations and substance abuse treatment as well as an intensive parenting skills program, homemaker services, visitation, psychological and psychiatric evaluations and domestic violence counseling. A.R. has had bi-weekly visits with her children since their removal. There is no dispute with respect to the services rendered. The judge found DYFS sustained its burden as to this prong, and there is no challenge by A.R. or the Law Guardian to that determination. To the contrary, A.R. insists she took full advantage of the services rendered, and succeeded to such a point that reunification was properly ordered.

(4)
The fourth prong addresses whether "[t]ermination of parental rights will not do more harm than good." N.J.S.A. 30:4C-15.1(a)(4). It asks "whether, after considering and balancing the [child's] relationships [with the foster parents and the birth parents], the child will suffer a greater harm from the termination of ties with [his or] her natural parents than from the permanent disruption of [his or] her relationship with [his or] her foster parents." K.H.O., supra, *188 161 N.J. at 355, 736 A.2d 1246. "Prong four `serves as a fail-safe against termination even where the remaining standards have been met.'" E.P., supra, 196 N.J. at 108, 952 A.2d 436 (quoting G.L., supra, 191 N.J. at 609, 926 A.2d 320). "[T]o satisfy the fourth prong," DYFS must "offer testimony of a `well-qualified expert who has had full opportunity to make a comprehensive, objective, and informed evaluation' of the child's relationship with both the natural parents and the foster parents." M.M., supra, 189 N.J. at 281, 914 A.2d 1265 (quoting J.C., supra, 129 N.J. at 19, 608 A.2d 1312).
It is well established that there is a "paramount need" for "children [to] have ... permanent and defined parent-child relationships." J.C., supra, 129 N.J. at 26, 608 A.2d 1312. See also E.P., supra, 196 N.J. at 110, 952 A.2d 436. Thus, a key consideration for the court is also the "child's need for permanency." M.M., supra, 189 N.J. at 281, 914 A.2d 1265; see also K.H.O., supra, 161 N.J. at 357, 736 A.2d 1246 (holding that in applying statutory standards in guardianship and adoption cases, the trial court should be "cognizant of New Jersey's strong public policy in favor of permanency"). Moreover, in light of the goal of achieving a stable and permanent home for the child, there are "limits on the amount of time a parent may have to correct conditions at home in anticipation of reunification." K.H.O., supra, 161 N.J. at 358, 736 A.2d 1246. However, this desire for permanency must be balanced against the need natural parents have to depend on foster care to "protect their children during difficult periods, including but not limited to experiences of homelessness and domestic violence. A single-minded focus on continuity in care can result in parents who rely temporarily on foster care for needed assistance, finding it impossible to regain custody over their children." J.C., supra, 129 N.J. at 20-21, 608 A.2d 1312. See also E.P., supra, 196 N.J. at 110-11, 952 A.2d 436 (where the "unlikely possibility" of a permanent placement or adoption did not outweigh the relationship with a natural parent). The same is true of parents facing problems affecting their ability to parent but who are motivated and able to overcome those issues.
DYFS contends that A.R.'s inability to stay current on her rent and utility bills, her predisposition to relationships with violent, unstable men, and her difficulties in managing her four children while working full time and remaining in recovery should have been weighed more heavily. DYFS also emphasizes that A.R. has already had two failed reunifications and that another failure would be permanently detrimental to Junior's need for permanency and stability. However, DYFS ignores its own abilities and the progress it has helped A.R. achieve. As the trial judge found here, A.R., in essence a single mother of modest ability to earn a livelihood can nevertheless be a good parent when provided the support she does not otherwise receive from a loving, caring family. On this appeal, DYFS does not challenge the trial court's denial of termination as to A.R.'s three other childrenJunior's sister and half-sisters. Even though there is no dispute that the four prongs must be evaluated separately as to each child, see M.M., supra, 189 N.J. at 284-85, 914 A.2d 1265, the lack of appeal with respect to A.R.'s older children represents DYFS's present view that A.R. has demonstrated a potential to be a good parent. The fact that Junior is younger and removed from the home at an earlier age should not, in these circumstances, deprive him of a relationship with his mother and siblings. See New Jersey Div. of Youth v. S.S., 187 N.J. 556, 560-62, 902 A.2d 215 (2006); State *189 Div. of Youth & Fam. v. T.C., 251 N.J.Super. 419, 438-39, 598 A.2d 899 (App.Div. 1991), certif. denied, 146 N.J. 564, 683 A.2d 1160 (1992).
The trial court found that A.R. could provide a stable home for her children, despite her obstacles. Judge Nelson based this determination on A.R.'s successful compliance with the services DYFS had provided thus far, her success in recovery, and her ability to retain steady employment. The judge also found that DYFS failed "to provide evidence to compare and contrast the relationships of [Junior] with his foster parents and ... with his mother." As a result, Judge Nelson held that DYFS failed to prove, by clear and convincing evidence, that terminating A.R.'s parental rights would not do more harm than good. We cannot disturb this finding.
DYFS emphasizes the trauma Junior would experience if he was separated from his foster parents. However, loving-caring foster parents worthy of that role would assist in a gradual and beneficial reunification in the best interests of Junior. Moreover, the fourth prong "does not provide an independent basis for termination where the other standards have not been satisfied." G.L., supra, 191 N.J. at 609, 926 A.2d 320.

IV.
A.R. and the Law Guardian both complain that the judgment of the Family Part has not been implemented while Junior bonds more with his foster family and remains further separated from his mother. We do not attribute bad faith or bad motives to DYFS. Its conduct is undoubtedly based on its beliefs about Junior's best interests, and perhaps the belief that if we agree with it concerning the need for a comparative bonding evaluation, we will remand and it will then prevail after the evaluation is conducted.
A termination case cannot turn on procedural niceties or gamesmanship. We do not affirm merely because a second bonding evaluation was not scheduled and conducted before the trial. This is particularly true because A.R. was advised by counsel not to attend a second bonding and psychological evaluation scheduled by DYFS before the December 17, 2007 hearing, when the issue of DYFS's request to conduct the second evaluation was to be considered by the court.
Rather, we affirm because the record and findings warrant the same in light of the experts' evaluations and their testimony, the lack of appeal with respect to the siblings and A.R.'s ability to parent them and the progress that has been made. There is no suggestion that Junior had "special needs" warranting treating Junior differently than his sisters. See, e.g., N.J. Div. of Youth & Family Servs. v. S.A., 382 N.J.Super. 525, 536-37, 889 A.2d 1120 (App.Div.2006). See also M.M., supra, 189 N.J. at 269, 284-85, 914 A.2d 1265.
In its motion to supplement the record, DYFS points to A.R.'s recent difficulty in paying her rent and utility bills on time, despite her promotion to a supervisor at McDonald'sa problem faced by many good parents in this economybut not to any harm or neglect of the children in her care and custody. In that context, we also find significant that no one suggests A.R. did not file her complaint for divorce in good faith or intend to keep C.S. away from the family when he is paroled. G.L., supra, 191 N.J. at 607-08, 926 A.2d 320 (2007); See also M.M., supra, 189 N.J. at 288-90, 914 A.2d 1265.
We add only that if DYFS continues to delay the ordered reunification, the trial court can appoint a professional to oversee and direct a prompt and appropriate reunification. *190 See G.L., supra, 191 N.J. at 609, 926 A.2d 320.
The judgment is affirmed, and the matter is remanded for further proceedings consistent with this opinion.
NOTES
[1] We use fictitious names for all the children in order to maintain the anonymity of the family.
[2] Because two experts have the same surname, we refer to them by their first initials.
[3] Dr. J. Singer mistakenly referred to C.S. as A.R.'s ex-husband. A.R. had filed for divorce, but it was not final by the time of trial or the appeal before us.
[4] As already noted, DYFS received permission to have a second bonding evaluation with A.R. performed before trial because Junior slept through the one conducted by Dr. Bromberg. However, it was not conducted before the trial.