**RECORD IMPOUNDED**

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court."
Although it is posted on the internet, this opinion is binding only on the
parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1306-16T3

NEW JERSEY DIVISION OF CHILD
PROTECTION AND PERMANENCY,

    Plaintiff-Respondent,

v.

L.F.,

    Defendant-Appellant,

and

I.W.,

    Defendant.

_____

IN THE MATTER OF L.W., a minor.

_____

        Argued May 30, 2018 — Decided August 1, 2018

        Before Judges Carroll, Mawla, and DeAlmeida.

        On appeal from Superior Court of New Jersey,
        Chancery Division, Family Part, Essex County,
        Docket No. FN-07-0596-14.

        Adrienne M. Kalosieh, Assistant Deputy Public
        Defender, argued the cause for appellant
        (Joseph E. Krakora, Public Defender, attorney;

Kylie A. Cohen, Assistant Deputy Public Defender, on the briefs).

Fatime Meka, Deputy Attorney General, argued the cause for respondent (Gurbir S. Grewal, Attorney General, attorney; Jason W. Rockwell, Assistant Attorney General, of counsel; Fatime Meka, Deputy Attorney General, on the brief).

Nancy P. Fratz, Assistant Deputy Public Defender, argued the cause for minor (Joseph E. Krakora, Public Defender, Law Guardian, attorney; Nancy P. Fratz, on the brief).

PER CURIAM

Defendant L.F.[1] appeals from the September 30, 2014 order of the Family Part finding she abused and neglected her daughter L.W. Having concluded that the record contains insufficient evidence to support the trial court's finding that L.F. created a substantial risk of harm to her child, we reverse.

I.

The following facts are taken from the record. L.F. gave birth to L.W. in May 2014. Both L.F. and her daughter had negative drug screens at the time the child was born. Although the child was not medically compromised, medical staff had concerns for her safety because L.F. disclosed to them that she had a history of substance abuse and prior involvement with the Division of Child Protection and Permanency (DCPP or the Division), including the

_____

[1] We use initials to protect the privacy of the parties.

termination of her parental rights to other children. Based only on L.F.'s reported history, hospital officials made a referral to the Division the day after the child's birth.[2]

After receiving the referral, DCPP conducted an investigation, during which L.F. and I.W., the child's father, agreed to cooperate with any recommended services. L.F. stated that she had not used drugs since 2007. The Division elected to leave the child in the care of L.F. and I.W. subject to implementation of a safety protection plan.

On June 3, 2014, the Division filed a complaint in the Family Part for care and supervision, but not custody, of the child, and to implement a safety protection plan. On the same day, the trial court held an order to show cause hearing on the complaint. Both parents were present. L.F.'s history with the Division was detailed for the court. She admitted to not having attended substance abuse treatment and claimed to have detoxed from drugs during a 2007 incarceration. She testified that she refrained

---

[2] The Division, then known as the Division of Youth and Family Services, first became involved with L.F. in 1997, shortly after she gave birth to a daughter. Nine additional referrals concerning L.F.'s substance abuse and other issues followed. L.F.'s parental rights to six of her children were terminated between 1997 and 2009. During the periods relevant to this appeal, another child of L.F. was living with a relative out of state. In 1999, 2001, and 2007, L.F. was found to have abused or neglected a recently born child, born underweight after no prenatal care, and who tested positive at birth for methadone, heroin, and/or cocaine.

from using drugs since that time. L.F. admitted to having had only two prenatal medical visits prior to delivering L.W. because she did not know she was pregnant during the early part of her pregnancy. She also acknowledged that while she was pregnant with the child, I.W. was on probation for receiving stolen property, and was arrested for theft and forgery.

A written safety protection plan was not introduced as evidence. A Division representative, however, described the plan as permitting the child to reside with her parents, provided that "the paternal great grandmother would reside with them and be a primary caretaker for that child." The plan also required the parents to submit to psychological evaluations and periodic drug screens. The court granted care and supervision of the child to the Division, and released the child to her parents' custody, conditioned on the safety protection plan.

A drug test administered to L.F. at the hearing was positive for marijuana. I.W.'s drug screen was negative. As a result of the positive drug screen, the Division referred L.F. to a certified alcohol and drug counselor evaluation and placed Family Preservation Services (FPS) in the home.

On June 10, 2014, L.F. submitted to a psychological evaluation by Dr. Albert Griffith. She admitted to having a history of substance abuse, and that she did not complete formal drug

4

treatment. Dr. Griffith noted that L.F.'s affect was appropriate and that she did not show physical signs of drug use or withdrawal during the evaluation. He found L.F.'s narcissism scale to be elevated.

Dr. Griffith made the following findings:

1. Given her recent use of marijuana and insistence that she has been drug-free since 2007, there is both substance abuse and willingness to tell an obvious lie. At the very least this implies that her recovery is a work in progress.

2. [L.F.'s] resistance to treatment makes recovery difficult. The fact that she is now age [forty] and still using, suggests that prognosis for recovery is even poorer. When this is combined with narcissism it makes willingness to conform to normal standards of behavior more difficult still.

3. [L.F.] is in her second long-term relationship with a gentleman with little regard for the law. In view of the fact that her partner insists on committing the same crimes and getting annual incarcerations, it is unlikely that stability can become part of this family picture.

4. [L.F.'s] continued substance abuse, lack of treatment, and entrenched denial system give her little chance of being able to consistently care for the needs of an infant without danger of neglect.

5. Were [L.F.] to be serious about recovery, she would have to complete an IOP (sic), have [six] months of aftercare, with consistent urine monitoring over the entire period. In addition[,] she would have to enter psychotherapy to deal with some of her

abandonment and anger issues. Finally[,] she would have to complete parenting classes.

Dr. Griffith made the following recommendations:

1. Given [L.F.'s] history and present pattern of lying, there is little probability that she can successfully parent the newborn.

2. The absence of her older child from her care gives further reason for concern about her day-to-day functioning.

3. The combination of [L.F.'s] untreated addiction and narcissistic personality disorder suggest that she is unlikely to be a reasonable parent for this infant and that the child would be placed at risk in her sole care.

On June 13, 2014, DCPP amended its complaint to seek custody of L.W., in addition to her care and supervision. The Division relied on Dr. Griffith's report, L.F.'s June 3, 2014 positive drug test, her history with the Division, prior substance abuse, and past noncompliance with Division-recommended services.

That day, the trial court held an emergent hearing on the Division's amended complaint. Drug screens for both parents on the day of the hearing were negative. L.F. objected to the admission of Dr. Griffith's report, arguing that his opinion is not reliable evidence because there is "no connection . . . between whatever [he] is finding and actual harm or risk of harm to the child," and because the report contains hearsay opinion. The trial court overruled L.F.'s objection.

6                                                        A-1306-16T3

In addition, L.F.'s counsel argued that the court should

> accept the fact that on June 3rd, the date
> that [L.F.] allegedly tested positive in a
> court instant test she actually has competing
> documentation. She went to a clinical
> laboratory and had herself tested and she's
> negative. Would Your Honor accept this as
> evidence to repeat that test in the file?

DCPP's counsel objected to admission of the independent test results obtained by L.F., which he described as incomplete and uncertified. The trial court declined to consider the test results proffered by L.F.

The court concluded that "based on Dr. Griffith's analysis that the Division should be granted custody" of the child. When addressing L.F.'s objection to admission of Dr. Griffith's report without testimony and the opportunity for cross-examination, the court found that the Division merely needed to establish a prima facie case to be granted temporary custody of the child and that "[t]hey do[ not] have to prove their case today. They will do that at a factfinding, not today. But . . . they might need the expert to come in and testify at that time."

Notably, when discussing the safety protection plan in place at L.F.'s home, the court noted that the child's paternal great grandmother would be "[a] primary [caregiver] — a, not the — because there's a difference . . . [t]here's a big difference."

A-1306-16T3

The trial court granted the Division the care, custody, and supervision of L.W. The Division placed the child in non-relative foster care.[3]

On July 31, 2014, the Division determined the allegations of abuse and neglect were substantiated. This determination was based on the conclusion that there was a substantial risk of harm to L.W. due to her age, L.F.'s long history of drug use and related issues, prior terminations of parental rights, history with the Division, the June 3, 2014 positive drug test, and alleged violations of the safety protection plan.

On September 30, 2014, the trial court held a fact-finding hearing. The court admitted the Division's evidence without objection from L.F., although, as noted above, she objected to the admission of Dr. Griffith's report without his testimony at the June 13, 2014 hearing. A DCPP investigator testified regarding L.F.'s extensive history with the Division, her having exposed her children, other than L.W., to drugs and homelessness, and her longtime use of heroin and cocaine.

---

[3] Ultimately, L.F. completed all recommended services including individual therapy, parenting skills, and substance abuse treatment, and was reunified with the child. L.F. has not appealed the trial court's decisions regarding the care, custody, and supervision of L.W.

The investigator testified that L.F. did not seek prenatal care while pregnant with L.W. because she thought she could not conceive as a result of a prior surgical procedure. The investigator also testified that L.F. was compliant with all services offered by the Division after the child's birth. She testified, however, that L.F. violated the safety protection plan. According to the investigator, the plan required that L.W.'s paternal great grandmother be present in the home "at all times," but was not present on three occasions when representatives providing in-home counseling services were at the home. This testimony contradicted testimony at earlier proceedings in which the safety protection plan described the great grandmother as "a primary caretaker" of the child, and not as someone who had to be present in the home at all times. The written plan again was not offered as evidence.

On cross-examination, the investigator admitted that on each occasion that a Division representative visited the home, the child's living conditions were deemed satisfactory, no drugs were present, and no corrective action was taken or recommended by the Division. In addition, no Division representative observed or suspected drug or alcohol use by either parent on any home visit.

The investigator further testified that Dr. Griffith recommended L.F. comply with a substance abuse program due to her

history and positive marijuana test. The investigator was unaware, however, of L.F. having completed any drug treatment or other program addressing her substance abuse issues. Finally, the investigator testified that L.F. tested positive for "gin," although she did not identify the date or circumstances of the test, or explain how the test identified the type of alcohol L.F. had consumed.

A second Division caseworker testified that she was advised L.F. tested positive for suboxone during initial assessment after the Division filed its complaint. No evidence of a drug test positive for suboxone was offered as evidence. As a result of receiving this information, the Division referred L.F. to intensive outpatient treatment at Integrity House. The caseworker testified that L.F.'s drug counselor informed her that L.F. tested positive for alcohol on a number of occasions at the commencement of the treatment program. In response to receiving this information, the caseworker advised L.F. to abstain from all intoxicating substances. The record contains no evidence of alcohol use by L.F. after that advice was given.

The caseworker testified that it was the Division's intention to refer L.F. to a domestic violence liaison at a future date because L.F.'s drug treatment counselor noticed a bruise on L.F. and suspected she was the victim of domestic abuse. She also

A-1306-16T3

testified that the Division recommended that L.F. participate in drug treatment, parenting skills, and individual therapy services.

At the conclusion of the September 30, 2014 hearing, the trial court issued an oral decision, finding the Division had met its burden of proving by a preponderance of the evidence that L.F.'s actions put L.W. at a substantial risk of harm.  The court held:

> It is not necessary the Division prove actual harm, only the . . . substantial risk of harm.
>
> Here[,] we have an extensive, very extensive, long[-]term history with the Division, long term[-]us[e] of drugs.  We have positive screens, both for alcohol and for marijuana involved here.  We have the Division allowing custody under these circumstances, even with six [terminations of parental rights] and the prior substantiations, allowing the mother to have custody under strict provisions of Family Preservation and a safety protection plan.
>
> What do we have?  We have a violation of that plan.  Continued testing positive afterwards.  This is clearly -- there was a substantial risk of harm here.  I'm satisfied the Division has shown that in their case . . . there was a need for services based on the history and based on the psychological evaluations.  There's still a continued need for services or a lot of services still have to be done and completed.
>
> This is not a case where it is now safe as he indicates, where it's now safe to return the child because of the fact that there are still a number of services that need to be completed.

A-1306-16T3

> We have the Division involved. We have the Division in litigation. We [are] still getting positive tests. We still get a violation of [the] plan. This really is . . . on the defendants at that point. They had the opportunity at that point to keep the child in their custody. And because of their behavior and failure to comply . . . they still continue in (sic) risk of harm and bad judgment.

The court thereafter entered an Order memorializing the abuse and neglect finding against L.F. This appeal followed.

L.F. challenges the sufficiency of the evidence supporting the trial court's abuse and neglect finding. The Law Guardian supports L.F.'s appeal.[4]

## II.

N.J.S.A. 9:6-8.21(c)(4)(b) defines a child as abused or neglected where the child's

> physical, mental, or emotional condition has been impaired or is in imminent danger of becoming impaired as the result of the failure of his parent or guardian . . . to exercise a minimum degree of care . . . in providing the child with proper supervision or guardianship, by unreasonably inflicting or allowing to be inflicted harm, or substantial risk thereof . . . .

---

[4] "[T]he Law Guardian's position [is] of particular significance because" the Law Guardian "has to advocate for the best interests of [children] too young to speak for [themselves], and represents neither adversary in the case." N.J. Div. of Youth & Fam. Servs. v. A.R., 405 N.J. Super. 418, 433-34 (App. Div. 2009).

A failure to exercise a "minimum degree of care refers to conduct that is grossly or wantonly negligent, but not necessarily intentional." Dep't of Children & Families v. E.D.-O., 223 N.J 166, 179 (2015) (quoting G.S. v. Dept. of Human Servs., 157 N.J. 161, 178 (1999)). A parent or guardian "fails to exercise a minimum degree of care when he or she is aware of the dangers inherent in a situation and fails adequately to supervise the child or recklessly creates a risk of serious injury to that child." E.D.-O., 223 N.J. at 179 (quoting G.S., 157 N.J. at 181). A finding of abuse or neglect under N.J.S.A. 9:6-8.21(c)(4) "can be based on proof of imminent danger or a substantial risk of harm." Id. at 178 (quoting N.J. Dep't of Children & Families v. A.L., 213 N.J. 1, 23 (2013)). Actual harm need not be shown. Ibid.

"[T]he burden of proof" is "on [the Division] to establish the elements of abuse and neglect by a preponderance of the evidence." N.J. Div. of Youth & Fam. Servs. v. J.Y., 352 N.J. Super. 245, 266 (App. Div. 2002) (citing N.J.S.A. 9:6-8.46(b)). A finding of abuse and neglect must be based on "particularized review of a parent's or caretaker's actions and the impact of any act or omission on the child." E.D.-O., 223 N.J. at 180.

L.F. argues that the trial court erred by relying too heavily on her history with the Division, her drug use before L.W.'s birth,

and the termination of her parental rights to prior children, and not on the circumstances present when L.W. was born. She argues that the negative drug screens for L.F. and the child at birth establish that she did not expose the child to actual harm or a substantial risk of harm. In addition, L.F. argues that the trial court gave too much weight to her positive test result for marijuana, the veracity of which she contests, and alcohol after L.W.'s birth. According to L.F., the trial court failed to draw a distinction between the substances for which she tested positive and the more dangerous drugs she habitually used in the past. She also argues that the Division produced no evidence that she used marijuana, alcohol or any other intoxicant while in the presence of her child, or when she was responsible for caring for L.W.

L.F. also argues that the record contains no evidence that she violated the safety protection plan. L.F. points out that the record does not contain a written version of the plan, and that all witnesses agreed that the plan stated only that the child's great grandmother was to be a primary caregiver. There is no evidence in the record that the Division required that the great grandmother be present in the home at all times, or that L.F. be supervised when with the child. She points out that on each occasion when the great grandmother was found to be absent from

the home, the child was found to be in good condition, and no concern was raised regarding L.F.'s care for the child.

Our review of a trial court's findings of fact is limited and "findings by the trial court are binding on appeal when supported by adequate, substantial, credible evidence." Cesare v. Cesare, 154 N.J. 394, 411-12 (1998) (citing Rova Farms Resort, Inc. v. Inv'rs Ins. Co., 65 N.J. 474, 484 (1974)). Family courts have "broad discretion because of [their] specialized knowledge and experience in matters involving parental relationships and the best interests of children." N.J. Div. of Youth & Family Servs. v. F.M., 211 N.J. 420, 427 (2012). However, a "trial court's interpretation of the law and the legal consequences that flow from established facts [is] not entitled to any special deference." Manalapan Realty, LP v. Twp. Comm., 140 N.J. 366, 378 (1995).

Having carefully reviewed the record in light of the applicable legal standards, we conclude that the trial court erred in concluding that the Division established by a preponderance of the evidence that L.F. put her child at a substantial risk of harm.

In A.L., our Supreme Court held that a mother's history of drug use alone is insufficient to establish a substantial risk of harm to a child. 213 N.J. at 23. In that case, the Court examined facts similar to those presently before us. There, the mother

tested positive for cocaine upon her admission to the hospital to give birth to her child. Id. at 9. The child's meconium, or first stool, showed the presence of "cocaine metabolites," suggesting ingestion of the drug by the mother during pregnancy. Ibid. A referral by hospital personnel resulted in an investigation by the Division, which revealed that in addition to testing positive for cocaine just prior to delivery, the mother had a positive drug screen for marijuana four months before the child was born. Id. at 10. The mother denied ever using drugs, offering patently incredible excuses for the positive test results. Ibid. The child was determined to be in good health. He was released to his grandparents' home, where the parents also lived. Id. at 11.

The Division substantiated a finding that the mother had abused and neglected the child based on her drug use during pregnancy and filed a complaint for his care and supervision. Ibid. At a fact-finding hearing, the Division conceded the mother did not inflict actual harm on the child, and relied on an alleged substantial risk of harm because of her history of drug use. Id. at 9. The trial court record consisted entirely of Division records focusing on the mother's prenatal drug use. Id. at 12.

The trial court found that the mother's prenatal drug use, as corroborated by the presence of cocaine metabolites in the

child's meconium, proved by a preponderance of the evidence that she had abused and neglected the child.  Id. at 13.  We affirmed, finding that the mother's use of cocaine two days before the child's birth "created the very risk of harm that N.J.S.A. 9:6-8.21(c)(4)(b) is designed to prevent."  Id. at 14.

The Supreme Court reversed.  The Court began its analysis by noting that "evidence of actual impairment to the child will satisfy the statute" but "where there is no such proof, the critical focus is on evidence of imminent danger or substantial risk of harm."  Id. at 22.  The Court cautioned that

> not every instance of drug use by a parent during pregnancy, standing alone, will substantiate a finding of abuse and neglect in light of the specific language of the statute.  The proper focus is on the risk of substantial, imminent harm to the child, not on the past use of drugs alone.
>
> [Id. at 23 (footnote omitted).]

Test results showing the presence of drugs in a mother, and remnants of past drug use in a newly born child do "not establish proof of imminent danger or substantial risk of harm."  Id. at 27-28.  "Instead, the fact-sensitive nature of abuse and neglect cases turns on particularized evidence" establishing imminent danger or substantial risk of harm.  Id. at 28 (citations omitted).  Competent expert testimony based on reliable scientific theories and sound methodologies can illuminate the presence of a risk of

17

harm through analysis of the facts.  <u>Ibid.</u>  In the absence of such testimony, the Court concluded that the Division had not met its evidentiary burden and, as a result of that conclusion, vacated the finding of abuse and neglect.  <u>Id.</u> at 30.  <u>See also</u> <u>N.J. Div. of Youth & Fam. Servs. v. V.T.</u>, 423 N.J. Super. 320, 331 (App. Div. 2011) (reversing a trial court finding that a father abused and neglected a child by ingesting drugs two days prior to a visit with child, holding that "Title 9 is not intended to extend to all parents who imbibe illegal substances at any time.").

Here, both L.F. and the child tested negative for illegal substances at the time of the child's birth.  After the Division had been awarded custody of the child, and while the child's great grandmother was serving as a primary caregiver, L.F. tested positive for marijuana and alcohol.[5]  While recreational use of marijuana is illegal, consumption of alcohol is not.  Neither test result indicated L.F.'s level of intoxication.  And, neither was taken when L.F. had sole custody and control of the child. Notably, L.F. did not test positive for heroin, cocaine, or methadone, the substances she used in the past.  Nor is there any evidence that L.F. used drugs or alcohol in the presence of the

---

[5] Although one witness testified that she was told that L.F. tested positive for suboxone at a drug treatment program, the trial court's findings refer only to positive test results for marijuana and alcohol.

child, or while she was caring for the child. The positive test results, standing alone, are insufficient to prove a likelihood of relapse or that L.F. posed a substantial risk of harm to L.W.

The expert report offered by the Division also was insufficient to meet the Division's evidentiary burden. Dr. Griffith, relying primarily on L.F.'s history of drug abuse, the more recent positive marijuana test, and his apparent diagnosis of L.F. as having a narcissistic personality, opined that she is unlikely to be able to parent the child successfully. He did not opine that L.F. posed a substantial risk of harm to the child at the time that the Division intervened in this matter. Instead, he offered the opinion that the child would be at risk were L.F. to have sole custody. At no point after the birth of her daughter did L.F. have sole custody of the child. In fact, both I.W., who continually tested negative for drug use, and the child's paternal great grandmother, shared custody of the child with L.F., with supportive services provided by the Division. The expert's opinion is more in the nature of a recommendation that L.F. not be given sole custody of the child without substance abuse treatment than an observation that L.F. posed a substantial risk of harm to the child in the short period between her birth and the formulation of Dr. Griffith's opinion.

A-1306-16T3

Because Dr. Griffith did not testify, his opinion was not subject to cross-examination, and the basis for his conclusion was not explained. Although L.F. and the child's Law Guardian did not object to the admission of Dr. Griffith's report at the September hearing, an objection was made three months earlier when the Division's request for temporary custody was heard. At that time, the trial court noted that the Division "might" have to call Dr. Griffith as a witness at the fact-finding hearing. Yet, the Division was permitted to admit Dr. Griffith's report, including his opinion on the risk of harm posed by L.F., without testimony.

According to N.J.R.E. 808:

> [e]xpert opinion which is included in an admissible hearsay statement shall be excluded if the declarant has not been produced as a witness unless the trial judge finds that the circumstances involved in rendering the opinion, including the motive, duty, and interest of the declarant, whether litigation was contemplated by the declarant, the complexity of the subject matter, and the likelihood of accuracy of the opinion, tend to establish its trustworthiness.

As we have explained, while an expert report may be admissible as a business record of the Division, "when the expert is not produced as a witness, the rule requires the exclusion of his or her expert opinion, even if contained in a business record, unless the trial judge made specific findings regarding trustworthiness." N.J. Div. of Child Protection and Permanency v. N.T., 445 N.J. Super.

20

478, 501 (App. Div. 2016) (quoting N.J. Div. of Youth & Fam. Servs. v. M.G., 427 N.J. Super. 154, 174 (App. Div. 2012)). Here, the trial court adopted the expert's opinion without making findings regarding his credibility. The absence of testimony from Dr. Griffith leaves the trial record bare of evidence on which the trial court could have evaluated the trustworthiness of the opinion he offered. We find this error to be of sufficient significance to warrant reversal of the abuse and neglect finding.

We also find that the record does not contain sufficient evidence supporting the trial court's conclusion that L.F. violated the safety protection plan. As noted above, the record does not contain a copy of the written plan. It is, therefore, not possible to determine with precision its terms. The witnesses agreed that the child's paternal great grandmother was to serve as a primary caregiver. No one, however, testified that the plan prohibited L.F. from being unsupervised when with the child. Indeed, the trial court noted that designating the great grandmother as "a primary caregiver" suggests non-exclusivity, as opposed to "the primary caregiver," a difference the court found to be significant.

Moreover, on each occasion when Division representatives observed L.F. in the home without the great grandmother, the child was determined to be safe and no referral was made. Notably, a

21

family preservation services representative was present at the home every time the great grandmother's absence was observed, raising the possibility that she left L.F. with the child knowing that supportive services were expected to be at the home.

Reversed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-1306-16T3