RECORD IMPOUNDED

 NOT FOR PUBLICATION WITHOUT THE
 APPROVAL OF THE APPELLATE DIVISION
 This opinion shall not "constitute precedent or be binding upon any court."
 Although it is posted on the internet, this opinion is binding only on the
 parties in the case and its use in other cases is limited. R.1:36-3.

 SUPERIOR COURT OF NEW JERSEY
 APPELLATE DIVISION
 DOCKET NO. A-5099-15T3
 A-5390-15T3

NEW JERSEY DIVISION OF CHILD
PROTECTION AND PERMANENCY,

 Plaintiff-Respondent,

v.

L.T. and J.L.-G.

 Defendants-Appellants.
______________________________

IN THE MATTER OF THE
GUARDIANSHIP OF C.I.T.,
J.D.T., and K.M.T.,

 Minors.
______________________________

 Submitted May 10, 2017 – Decided June 22, 2017

 Before Judges Lihotz, Hoffman and Whipple.

 On appeal from Superior Court of New Jersey,
 Chancery Division, Family Part, Middlesex
 County, Docket No. FG-12-79-16.

 Joseph E. Krakora, Public Defender, attorney
 for appellant L.T. (Marc D. Pereira,
 Designated Counsel, on the brief).
 Joseph E. Krakora, Public Defender, attorney
 for appellant J.L.-G. (James D. O'Kelly,
 Designated Counsel, on the brief).

 Christopher S. Porrino, Attorney General,
 attorney for respondent (Melissa Dutton
 Schaffer, Assistant Attorney General, of
 counsel; Kimberly Ann Eaton, Deputy Attorney
 General, on the brief).

 Joseph E. Krakora, Public Defender, Law
 Guardian, attorney for minors (Rachel E.
 Seidman, Assistant Deputy Public Defender, on
 the brief).

PER CURIAM

 Defendants, L.T. (Laura) and J.L.-G. (John) appeal from a

July 8, 2016 judgment of guardianship terminating their parental

rights.1 We affirm.

 Laura is the biological mother of Caryn, Josh, and Kristy.

John is the biological father of Kristy;2 Laura and John have been

together for more than ten years. Laura has a tenth grade

education, and suffers from some cognitive limitations. John was

born in Honduras and immigrated to the United States in 1985.

 In 2010, the Division of Child Protection and Permanency

(Division) received a referral because Josh was psychiatrically

hospitalized for the second time for behavioral issues. On

1
 We use pseudonyms to protect the identity of the parties and
their children.
2
 The fathers of Caryn and Josh have not been identified and are
not parties to this appeal.

 2 A-5099-15T3
September 20, 2013, a neighbor reported the family to the Division.

The neighbor was afraid for the children who appeared dirty and

hungry, and who feared Laura and John because they hit them. The

neighbor also reported bed bugs in the home. The neighbor reported

Caryn complained John was looking at her chest, which made her

uncomfortable, and Caryn kept a journal documenting her fear of

Laura and John.

 When the Division caseworker arrived to investigate, the

caseworker noted Josh had bruises and small circular marks on his

legs, which Josh said resulted because he often falls. Josh

reported John hits him with his hand and pulls his hair out. Josh

reported John makes him sit in "time out" for four hours, and John

curses and makes his mother cry. During the caseworker's interview

with Caryn, she reported John "always yells at us" and makes her

cry and feel scared and nervous. Caryn reported John makes her

uncomfortable when he talks about how Caryn is "developing." Caryn

admitted she kept a journal but gave it to the neighbor. Caryn

also reported John hit Kristy and pulled out Josh's hair. Kristy

reported John hit her on the arm.

 On September 26, 2013, Laura met privately with the Division's

domestic violence liaison. Laura complained John listens to her

phone calls, does not provide her enough money to pay the bills,

threatens her, and threatens to take Kristy to Honduras.

 3 A-5099-15T3
 On September 30, Laura called the Division because Josh kicked

Caryn and might have broken her finger. The Division helped Laura

access services for Josh. On October 2, 2013, Margaret DeLong,

Psy.D., conducted a psychological evaluation of Josh and

recommended he participate in individual counseling and have no

further contact with John.

 On October 8, 2013, the landlord locked the family out of

their apartment and they had nowhere to go. When the Division

caseworker went to the family home, she found the family in their

car. The Division conducted an emergency removal and placed the

children with the maternal grandparents.

 On October 11, 2013, the court placed the children in the

custody, care, and supervision of the Division. The court ordered

Laura to submit to a neuropsychological evaluation, parenting

classes, multicultural services, and family counseling. The court

also ordered psychological evaluations for Caryn and Kristy;

individual counseling and assignment of a mentor for Josh; and

ordered John to attend a psychological evaluation, counseling at

the Batters Intervention Program, and parenting classes.

 Dr. DeLong evaluated Kristy and Caryn on October 23, 2013.

Caryn told Dr. DeLong she was "happy" to be away from John because

she "no longer ha[s] to suffer and see hitting and arguments."

She disclosed John used to rub her back and massage her and would

 4 A-5099-15T3
try to touch her stomach but it made her uncomfortable. Caryn

reported she was comfortable seeing her mother about once a week.

When asked why only once a week, Caryn responded, "Any time she

would come to see me, she would always have a problem with things."

Dr. DeLong recommended Caryn participate in individual counseling,

recreational and therapeutic activities with peers, participate

in a mentoring program, and have supervised therapeutic visits

with her mother. She recommended Caryn have no further contact

with John.

 Kristy told Dr. DeLong John hit her in the head, hits her

brother, and yells and curses at her siblings and mother. Kristy

reported she wants to live with her grandmother, but still wished

to visit John and Laura. Dr. DeLong recommended Kristy participate

in individual play therapy, recreational and/or therapeutic

activities with peers, a mentoring program, and have therapeutic

supervised visits with John and Laura.

 John had supervised visitation with Kristy, but was denied

visits with the other children. Laura had weekly visits with all

three children.

 In November 2013, Jonathan H. Mack, Psy.D., conducted a

neuropsychological and psychological evaluation of Laura. Dr.

Mack opined Laura "presents as having moderate neurocognitive

dysfunction with significant underlying brain damage." Dr. Mack

 5 A-5099-15T3
diagnosed Laura with a mild intellectual disability, major

neurocognitive disorder due to multiple etiologies, and

personality change and/or development variant due to brain

injury/damage. Dr. Mack found Laura incapable of being a minimally

effective parent and to be effective, she would need to separate

from John and would need massive support. Dr. Mack recommended

ongoing psychiatric evaluations and treatment, psychological

therapy with a neuropsychologist, anger management and parenting

classes, and "in-home, ongoing and frequent parental supervision."

 Around this time, Josh underwent a psychiatric evaluation

with Vivian Shnaidman, M.D. He told Dr. Shnaidman "all the

problems started" when John moved in with the family. Josh

reported he wants to live with his mother, "but . . . can't because

of [John]." Additionally, Josh reported John blames the children

for not being able to keep a job because "the kids annoy him and

he has to go to the kids' school." Dr. Shnaidman opined Josh was

"extremely hyperactive but not inattentive," and with "appropriate

treatment, including psychotherapy and possibly medication,"

Josh's prognosis was good. Dr. Shnaidman recommended Josh see a

board-certified child psychiatrist on a regular basis.

 John underwent a psychological evaluation by Helen Raytek,

Psy.D., on December 2, 2013. Dr. Raytek recommended Laura and

John attend parenting skills training and family therapy, and the

 6 A-5099-15T3
Division should not return the children to Laura and John's care

"unless they make significant progress in parent-training and

family therapy." Dr. Raytek recommended any steps toward

reunification must be slow and gradual.

 Laura and John did not have a place to live and in January

2014, were still sleeping in their truck. On January 30, 2014,

John and Laura were finally placed in a shelter, but in May 2014,

Laura's application for housing through Middlesex Board of Social

Services was denied because John failed to complete WorkFirst. On

May 28, 2014, Laura told the caseworker she and John were homeless

again. The Division learned John's residency card would expire

on August 31, 2014, and John would not qualify to renew his visa

because of his arrest history. Laura and John's participation in

Division services deteriorated because of their homelessness.

 John and Laura missed the January 23 and 30, 2014 visits.

John missed two batterer's counseling sessions. Catholic

Charities contacted the Division on February 6, 2014, reporting

John and Laura were on the wait list for supervised visitations.

Around this time, John obtained employment but eventually quit

while Laura continued to be unemployed.

 The Title Nine fact-finding hearing took place on February

26, March 21, and May 2, 2014. The court found John failed "to

exercise a minimum degree of care and supervision by allowing the

 7 A-5099-15T3
children to witness acts of domestic violence, berating the

children, [and] using excessive means of punishment on the

children." Laura was found to not have abused or neglected the

children. The court ordered the matter to remain open as a Title

30 matter in order for the Division to provide services to the

children and Laura.

 On October 22, 2014, the court entered a permanency order

finding Laura and John had not complied or completed the court

ordered services and approved the placement of the children with

the grandmother under a plan of kinship legal guardianship.

However, on April 1, 2015, the children were removed from the

grandmother's home because the grandmother did not report Caryn

was cutting herself and did not disclose there were other

individuals residing in her home, among other concerns. The

children were subsequently placed in a resource home.

 Laura and John missed scheduled visits in April and May 2015,

and cancelled their family counseling appointment. On May 21,

2015, Mark Mina, a Clinical Social Worker supervising the family's

counseling, wrote to the Division about the family's progress.

Mina reported Laura's insight and judgment as a parent were

impaired based upon her repeated requests to have the children

back despite being homeless and unemployed. Mina noted the

children appeared emotionally distant from their mother, and did

 8 A-5099-15T3
not express any signs of excitement or happiness when they greet

her. Mina opined John needed to learn how to control his anger

and improve his communication skills. He found "the parents'

ability to care for their children is questionable."

 In June 2015, the Division mailed rule out letters to three

maternal aunts. Laura informed the caseworker she and John were

still living out of their car.

 Bonding evaluations of Laura and the three children were

conducted by Karen D. Wells, Psy.D., on June 30, 2015. Dr. Wells

reported it was clear to the children Laura had "substantially

failed to provide them with a safe environment and has not

prioritize[d] their well-being above her desire to remain in a

relationship that is recognized by them as abusive and

dysfunctional." Laura told Dr. Wells the children would be coming

back to her because she refused to sign anything relinquishing her

parental rights. Dr. Wells considered Caryn more cognitively

advanced than Laura and testified "the children seem to recognize

that [Laura] values the maintenance of her relationship with [John]

above all, including them being remitted in her care."

 Dr. Wells found "little to no indication that a parent-child

bond exists between the children" and Laura. She found the

children did not view her as their primary psychological parent,

and concluded Laura is "unable to independently parent, as she

 9 A-5099-15T3
requires guidance to attend to her own needs, lacks the capacity

for good reasoning and solid judgment, and is limited in her

capacity to appreciate the impact of her behaviors and choices to

herself and her children." As such, Dr. Wells recommended the

Division pursue permanency for the children independent of Laura.

Dr. Wells found the children would not suffer irreparable and

enduring psychological harm if not reunified with their mother.

 Dr. Wells also conducted a bonding evaluation between John

and Kristy. While noting Kristy feels comfortable with John, Dr.

Wells found no secure bond as Kristy "knows that he is not her

primary custodial caregiver and has not attended to her basic

physical needs for close to two years." Kristy has a psychological

and emotional bond to John, but that bond was fluid and there was

no indication Kristy becomes distressed when separated from him.

Dr. Wells opined John "lack[s] an understanding and appreciation

of a child's development, with little leniency granted when a

child does not comply consistent with his expectations." Dr.

Wells concluded Kristy needed permanency independent of John and

placement with her maternal siblings was critical.

 On August 25, 2015, Mina reported to the Division that

Kristy's emotional attachment towards John was improving through

participation in family counseling. Mina stated John was gaining

more control over his anger, but additional improvement was

 10 A-5099-15T3
necessary. Mina noted Laura was still having trouble engaging

with the children, though she was more relaxed and willing to

communicate. He noted, however, the children expressed no signs

of excitement or happiness when they see their mother.

 On August 31, 2015, the court approved the Division's

permanency plan for termination of parental rights followed by

adoption. On September 18, 2015, the children were placed in a

new resource home, where they remain. On December 16, 2015, the

Division filed a complaint for guardianship.

 Dr. Wells conducted updated bonding evaluations on May 10,

2016, between the children and Laura, wherein each child expressed

an interest in being adopted by the resource parents. Dr. Wells

opined the children lack a significant bond with Laura and despite

the weekly contact, the bond had not improved. She found the

children did not relate to Laura as a maternal figure and do not

"initiate communication with her, seek her attention, approval or

comfort." Dr. Wells concluded none of the children would

"experience irreparable and enduring psychological harm" were all

contact with Laura permanently severed.

 Dr. Wells thought the child-parent bond between the children

and the resource parents was "remarkable" after only nine months

of the children living with them and noted "[t]here is no question

that [the children] find their relationships to be highly valued

 11 A-5099-15T3
and important." Dr. Wells concluded if the relationship between

the resource parents and the children were terminated, they would

experience "grave and severe enduring and irreparable

psychological and emotional harm."

 Dr. Wells concluded Laura's "ability to function in an adult-

like manner is extremely deficient" and "any child placed in her

care would be susceptible to risk of harm, with such likelihood

increasing when stress is present." Because of Laura's cognitive

deficiencies and submissive behaviors, Dr. Wells found "[t]here

are no indications that [Laura] presently or will in the

foreseeable future, be able to provide even minimal parental care"

to her children. She concluded reuniting the children with Laura

would pose emotional and psychological harm.

 Dr. Wells also conducted an updated bonding evaluation of

John and Kristy. Dr. Wells noted during their interaction, Kristy

did not seem interested in engaging with John. Dr. Wells opined

the parental relationship between John and Kristy is beginning to

wane since the first bonding evaluation nine months prior. Dr.

Wells found there to be no indication Kristy wants to be reunited

with John and has expressed her interest in being adopted by the

resource parents. According to Dr. Wells, John has not

demonstrated any progress to stabilize his life, despite the

services and support offered to him. Therefore, Dr. Wells

 12 A-5099-15T3
concluded John "cannot provide adequate and appropriate parental

care and responsibility for" Kristy.

 The guardianship trial occurred on June 14, and 15, 2016.

Two division caseworkers, Monica Gordon and Natasha Freeman, as

well as Dr. Wells, testified on behalf of the Division. John

testified on his own behalf, but no other party presented

additional evidence or witnesses. Gordon described the list of

services the Division provided Laura and John, including, domestic

violence counseling, referrals to the Batterer's Intervention

program, and parenting classes.

 Freeman was the adoption caseworker since October 2015. She

testified Laura and John were still living in their car, John was

supposed to provide her paystubs from his employer to prove his

employment, and she did not believe Laura was working. Freeman

testified about the children's frustration with having visitation

and their desire to no longer have visits. As to her observations

of supervised visitations, she expressed while there had been some

positive interactions, both Laura and John did not seem engaged

in their visits. As for the services the Division provided,

Freeman testified Laura made some progress in the individual

neuropsychological counseling but was unable to apply what she

learned to real life scenarios and only secured a minimal benefit.

 13 A-5099-15T3
 Dr. Wells, who the judge found credible, testified both Laura

and John "lacked the capacity to be able to effectively parent."

Specifically, Dr. Wells testified that even if Laura and John were

able to find somewhere to live with the children, the concern is

"about their functioning and their capacity to meet the demands

. . . [of] parenting day to day." Noting a bond between Kristy

and John remained "intact," Dr. Wells testified the bond was waning

and even if their relationship were somehow able to improve, Kristy

would be negatively affected by her separation from her siblings

and her resource parents. In contrast to the children's bond with

John and Laura, the bond between the children and the resource

parents was "intact and secure."

 John testified the Division never assisted them in securing

housing, despite being court ordered to do so. John stated he has

two different employment opportunities in both New Jersey and

Pennsylvania and each employer would allow him to rent an

apartment, as he would either be doing mechanic work for the one

and maintenance work for the other. When questioned in court,

John could not provide any specific information about either job.

 Because the judge found the Division had established all four

prongs by clear and convincing evidence, the court ordered the

 14 A-5099-15T3
termination of Laura and John's parental rights. A judgment of

guardianship was entered on July 8, 2016. These appeals followed.3

 Our review of a trial judge's findings and decision to

terminate parental rights is limited. N.J. Div. of Youth & Family

Servs. v. M.M., 189 N.J. 261, 278-79 (2007). We will not reverse

the family court's termination decision "when there is substantial

credible evidence in the record to support the court's findings."

N.J. Div. of Youth & Family Servs. v. E.P., 196 N.J. 88, 104

(2008).

 We defer to the trial court's credibility findings and fact-

findings because of its expertise in family matters and its ability

to develop a "feel of the case that can never be realized by review

of the cold record." N.J. Div. of Youth & Family Servs. v. M.C.

III, 201 N.J. 328, 342-43 (2010) (citation omitted). We will not

disturb these findings unless they are "so wide of the mark that

the judge was clearly mistaken." N.J. Div. of Youth & Family

Servs. v. G.L., 191 N.J. 596, 605 (2007).

 Parents have a constitutionally protected right to raise

their biological children, even if placed in foster care. In re

Guardianship of J.C., 129 N.J. 1, 9-10 (1992) (citing Santosky v.

Kramer, 455 U.S. 745, 102 S. Ct. 1388, 71 L. Ed. 2d 599 (1982)).

3
 On August 19, 2016, we entered an order consolidating both
appeals.

 15 A-5099-15T3
The State may act to protect the welfare of the children, but this

is a limited authority, applying to circumstances where the parent

is unfit or the child has been harmed. Id. at 10; N.J.S.A. 30:4C-

12. To prevail in a proceeding to terminate parental rights, the

Division must establish each element of the "best interests test":

 (1) The child's safety, health, or
 development has been or will continue to be
 endangered by the parental relationship;

 (2) The parent is unwilling or unable to
 eliminate the harm facing the child or is
 unable or unwilling to provide a safe and
 stable home for the child and the delay of
 permanent placement will add to the harm.
 Such harm may include evidence that separating
 the child from his resource family parents
 would cause serious and enduring emotional or
 psychological harm to the child;

 (3) The division has made reasonable efforts
 to provide services to help the parent correct
 the circumstances which led to the child’s
 placement outside the home and the court has
 considered alternatives to termination of
 parental rights; and

 (4) Termination of parental rights will not
 do more harm than good.

 [N.J.S.A. 30:4C-15.1(a).]

 These four prongs "relate to and overlap with one another to

provide a comprehensive standard that identifies a child's best

interests." In re Guardianship of K.H.O., 161 N.J. 352, 348

(1999). The State must prove each prong of this test by clear and

convincing evidence. N.J. Div. of Youth & Family Servs. v. A.W.,

 16 A-5099-15T3
103 N.J. 591, 612 (1986). Courts may not use presumptions of

parental unfitness and any "doubts must be resolved against

termination of parental rights." K.H.O., supra, 161 N.J. at 347.

 I.

 Laura and John argue the Division did not establish by clear

and convincing evidence the children's health, safety, and

development was and continued to be endangered by the parental

relationship. We disagree.

 The first prong of the best interests test requires the

Division to prove the child's safety, health, or development has

been or will continue to be endangered by the parental

relationship. N.J.S.A. 30:4C-15.1(a)(1). The focus of the first

prong is not necessarily upon a single incident, but on "the effect

of harms arising from the parent-child relationship over time on

the child's health and development." K.H.O., supra, 161 N.J. at

348. Additionally, the harm to the child need not be physical,

but can also include "[s]erious and lasting emotional or

psychological harm . . . as the result of the action or inaction

of their biological parents." In re Guardianship of K.L.F., 129

N.J. 32, 44 (1992) (citing In re Guardianship of J.C., 129 N.J.

1, 18 (1992)).

 The inability of parents to provide day-to-day nurturing for

their child for a prolonged period of time is a harm which may

 17 A-5099-15T3
satisfy the first prong of the best interests test. K.H.O., supra,

161 N.J. at 356 (citing A.W., supra, 103 N.J. at 604-611). We

have said, "When the condition or behavior of a parent causes a

risk of harm, such as impermanence of the child's home and living

conditions, and the parent is unwilling or incapable of obtaining

appropriate treatment for that condition, the first subpart of the

statute has been proven." N.J. Div. of Youth & Family Servs. v.

H.R., 431 N.J. Super. 212, 223 (App. Div. 2013). Additional

considerations include whether "the delay in securing permanency

continues or adds to the child's harm." K.H.O., supra, 161 N.J.

at 348-49 (citing N.J.S.A. 30:4C-15.1(a)(2)).

 There is clear and convincing evidence in the record to

support finding Laura has been and continues to be unwilling to

eliminate the harm facing her children. The children were removed

from her care after reports of physical and emotional abuse by

John and reports the family was living in their car. She refused

to separate herself from John and did not show a willingness to

resolve the negative impact John has on the children's lives,

despite assuring the Division of her intentions to leave him at

the beginning of the investigation. The record establishes the

children were disinterested in their visits and Laura's cognitive

deficits hindered her ability to provide for the children's basic

needs. Despite the services provided by the Division, Laura

 18 A-5099-15T3
remains unemployed and the record establishes she has not

benefitted from those services. Laura's reliance on John and her

unwillingness to obtain employment has and will continue to place

the children at risk of harm.

 The Division also provided John with numerous services with

little effect. Dr. Wells found John blamed others for his own

problems and "lacked insight into his own behaviors." John was

found to have been abusive to all three children, but blamed Josh

for the Division being involved in their lives. All three children

reported John's verbal and physical abuse inside the home. The

evidence in the record clearly and convincingly establishes prong

one as to John.

 Both John and Laura, over a three-year period, failed to

remediate their homelessness and unemployment. Despite the

services and assistance of the Division, Laura and John have

continued to place the children at risk of harm. We are therefore

satisfied the court correctly concluded the Division established

prong one by clear and convincing evidence.

 II.

 Laura and John argue the Division failed to establish prong

two as they both actively engaged in Division services. We reject

their premise.

 19 A-5099-15T3
 The second prong of the best interests test considers whether

"[t]he parent is unwilling or unable to eliminate the harm facing

the child or is unable or unwilling to provide a safe and stable

home for the child and the delay of permanent placement will add

to the harm." N.J.S.A. 30:4C-15.1(a)(2). This inquiry looks not

only to whether a parent is fit, but also to whether he or she can

become fit within time to perform parental functions. J.C., supra,

129 N.J. at 10. Notably, facts supporting the first prong of the

best interests test also inform and may support the second prong

"as part of the comprehensive basis for determining the best

interests of the child." In re Guardianship of D.M.H., 161 N.J.

365, 379 (1999).

 The statute directs "[s]uch harm may include evidence that

separating the child from his resource family parents would cause

serious and enduring emotional or psychological harm to the

child[.]" N.J.S.A. 30:4C-15.1(a)(2). Our courts recognize

"reunification becomes increasingly difficult with the passage of

time because a child may develop bonds with his or her foster

family and gain a sense of permanency." M.M., supra, 189 N.J. at

291. This is particularly true where biological parents are

inattentive to their children, thereby encouraging them to bond

with their foster families. K.H.O., supra, 161 N.J. at 352.

Comparative evaluations of a child's relationship with her or his

 20 A-5099-15T3
foster parents and biological parents are generally necessary and

relevant to a proper analysis of both the second and fourth prongs

of the best interests test. N.J. Div. of Youth & Family Servs.

v. A.R., 405 N.J. Super. 418, 440 (App. Div. 2009). The record

is replete with efforts by the Division to assist both parents in

resolving their parental deficits.

 Laura argues the record does not support the finding she is

cognitively deficient and cannot remediate the harm to her

children. She argues she has completed the tenth grade, has one

year left to complete her GED, has held employment in the past,

and has been able to care for her children since their birth

without incident. Laura states she completed all services and did

everything she could to obtain housing and employment. Despite

Laura's claims, the record supports a finding Laura has been

unwilling or unable to remediate the harm the children faced.

Laura was unwilling to look for employment, as she believed she

would obtain disability benefits, despite job opportunities being

available. Laura also could have obtained social services for

housing, but her application was denied because she wanted to live

with John, who failed to complete WorkFirst and whose visa was in

the process of being renewed. Laura's housing situation could

have been remediated if not for Laura's unwillingness to separate

herself from John.

 21 A-5099-15T3
 Most importantly, not only was Laura unwilling to separate

herself from John in order to obtain housing, she was unwilling

to end her relationship with John at the expense of her children.

If the children were returned to her care, she would be unable to

protect them from the harsh physical discipline John had previously

inflicted. Despite knowing her children did not want to have

contact with John, Laura continued the relationship.

 John insisted his problems were caused by the children and

then perpetuated by the Division. John argues he actively engaged

in Division services and the Division did not demonstrate he had

limited cognitive functioning. Dr. Wells testified John viewed

others as the cause of his problems and therefore believed it was

the responsibility of others to fix those problems. Dr. Wells

opined John's cognitive functioning was low to below average and

no additional services could be provided to John to improve his

judgment.

 Additionally, Dr. Wells testified Laura and John would be

unable to help the children cope with the loss of the resource

parents if the children were reunited with them. Dr. Wells

testified if the children were removed from the resource parents,

it would be "devastating" for the children. While a waning bond

still existed between Kristy and John, all three children needed

permanency and the record demonstrates that even with additional

 22 A-5099-15T3
services, Laura and John will not be able to remediate the harm

to the children. There is more than enough evidence in the record

to support a finding under prong two.

 III.

 Laura argues she was provided with "boilerplate" Division

services, while John argues he was provided a case plan the

Division knew would be unsuccessful; therefore, the Division

failed to satisfy prong three. We disagree.

 In order to satisfy the requirements of N.J.S.A. 30:4C-

15.1(a)(3), the Division must prove that it has undertaken

"reasonable efforts to provide services to help the parent correct

the circumstances which led to the child's placement outside the

home and the court considered alternatives to termination of

parental rights." Reasonable efforts include helping the parent

develop a plan for appropriate services; providing the agreed upon

services in furtherance of family reunification; periodically

informing the parent of the child's progress, development and

health; and facilitating appropriate visitation. N.J.S.A. 30:4C-

15.1(c).

 What constitutes "reasonable efforts" depends on the

circumstances of the removal. N.J. Div. of Youth & Family Servs.

v. A.G., 344 N.J. Super. 418, 435 (App. Div. 2001), certif. denied,

171 N.J. 44 (2002). The failure or lack of success of such efforts

 23 A-5099-15T3
does not foreclose a finding that the Division met its statutory

burden to try to reunify the child with the family. D.M.H., supra,

161 N.J. at 393. The Division need not continue services

indefinitely; even with reasonable efforts, the Division may not

be able to salvage a parental relationship. N.J. Div. of Youth &

Family Servs. v. F.M., 211 N.J. 420, 452 (2012).

 Laura argues the Division did not provide her with

neuropsychological counseling until almost a year and a half after

it was initially recommended. That is true, but Dr. Wells

testified Laura would not have benefitted from such counselling

because Laura's cognitive functioning was too limited.

 Laura argues the Division focused solely on her cognitive

limitations, ignoring the fact she completed all Division services

and said she would move away from John. The Division provided

Laura with psychological evaluations, psychiatric evaluations,

parenting training, counseling and support services, family and

individual counseling, domestic violence counseling, and

neuropsychological counseling. The Division also provided

transportation to the visitations, transportation to services,

assisted with Division of Development Disabilities (DDD) and

Division of Vocational Rehabilitation (DVR) applications, family

team meetings and case planning, and coordinated with social

 24 A-5099-15T3
services agencies. The Division provided Laura and John with

services over a three-year period that were beyond "boilerplate."

 While Laura did participate in Division services, the record

establishes Laura did not advance despite those services. She

remained homeless and unemployed, and was no closer to providing

her children with a safe and stable home than she was when the

children were removed. Despite Laura's claims she was willing to

move away from John, she continued to stay with him and wanted to

bring John to visits with Caryn and Josh. The Division made

reasonable efforts to provide Laura with services, ranging from

domestic violence classes to assisting in filling out DDD

applications, but ultimately, Laura was unwilling or unable to

apply what she had learned in counseling to real life situations.

 John argues the Division focused the case plan only as to

Laura. John also argues the Division only assisted Laura with the

DDD and DVR applications. John was not eligible for DDD benefits

because he does not suffer from a mental disability, therefore the

Division could not have assisted him in filling out the

applications. In addition, John was not qualified for DVR benefits

because he did not complete WorkFirst and his visa was about to

expire. Therefore, the Division did not unfairly assist Laura

over John; John was not eligible for the same services. Besides

the assistance with the applications, John was provided with the

 25 A-5099-15T3
same services as Laura. Therefore, the Division made reasonable

efforts in order to provide John with services.

 The court considered alternatives to termination. The

Division attempted to find the suspected fathers of Caryn and

Josh, whose names were provided by Laura; however, the named

fathers were ruled out by a paternity test. Additionally, the

Division sent three rule out letters to three maternal aunts who

could not take the three children. As for the maternal

grandmother, the Division removed the children from her care after

it was discovered she was allowing two adult men to live in her

home and she did not report to the police a neighbor had

inappropriately touched Caryn or that Caryn was self-harming.

Despite Laura's arguments the Division should have provided the

maternal grandmother with more services, the record supports a

finding that the Division made reasonable efforts in seeking

alternatives to termination of Laura and John's parental rights.

As such, the Division established prong three by clear and

convincing evidence.

 IV.

 Finally, we reject Laura and John's argument termination of

parental rights will do more harm than good; therefore, the

Division has not established prong four.

 26 A-5099-15T3
 To satisfy the fourth prong, the Division must prove by clear

and convincing evidence that "[t]ermination of parental rights

will not do more harm than good." N.J.S.A. 30:4C-15.1(a)(4). The

court must determine "whether a child's interest will be best

served by completely terminating the child's relationship with

that parent." E.P., supra, 196 N.J. at 108. "The crux of the

fourth statutory subpart is the child's need for a permanent and

stable home, along with a defined parent-child relationship."

H.R., supra, 431 N.J. Super. at 226 (citation omitted). Where the

child is living with foster parents, the court balances the

relationship of the child with both the biological and foster

parents. K.H.O., supra, 161 N.J. at 355. The question is not

whether the child will suffer any harm; rather, the question is

whether "the child will suffer a greater harm from the termination

of ties with her natural parents than from the permanent disruption

of her relationship with her foster parents." Ibid. To answer

that question requires expert inquiry as to the strength of each

relationship. Ibid.

 Dr. Wells' unrebutted opinion was the children do not view

Laura as a maternal figure, lacked a significant bond with her,

and the children did not seek her attention, approval or comfort.

Moreover, the children all verbalized a wish to be adopted by

their resource parents. Josh stated that he "never knew a mom and

 27 A-5099-15T3
dad until [he] knew [the resource parents]." Dr. Wells concluded

there were "no indications that if all contact were to be

permanently severed, would any of the children experience

irreparable and enduring psychological harm."

 Dr. Wells warned of harm that would occur to the children if

they were removed from their resource parents. Dr. Wells stated

the bond between the children and the resource parents after only

nine months was "remarkable," especially noting the behavioral and

emotional progress Josh has made since being in their care. Dr.

Wells testified if Josh were removed from the resource parents,

she feared his behavior would regress and he would begin to exhibit

the same aggressive behavior he exhibited while living with John

and Laura. Dr. Wells found the resource parents would be able to

remedy any harm caused by the termination of Laura and John's

parental rights and concluded if the children were removed from

the resource parents they would experience "grave and severe

enduring and irreparable psychological and emotional harm."

 The bond between John and Kristy was thought to be waning and

there was no indication Kristy wanted to be reunited with John,

and she too expressed a significant interest in being adopted by

the resource parents. Dr. Wells concluded John was unable to

provide for Kristy's needs in the long term. Dr. Wells testified

Kristy was relieved at the end of the evaluation because she

 28 A-5099-15T3
believed it was the last time she would have to see her biological

parents. Therefore, if the bond between John and Kristy were to

be severed it would not do more harm than good. Based on all of

the evidence in the record, the trial court correctly found the

Division satisfied its burden under prong four. We discern no

reason to disturb that determination.

 Affirmed.

 29 A-5099-15T3