# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0009-18T4

NEW JERSEY DIVISION
OF CHILD PROTECTION
AND PERMANENCY,

      Plaintiff-Respondent,

v.

A.S.,

      Defendant-Appellant.

_____

IN THE MATTER OF THE
GUARDIANSHIP OF J.L.,

      a Minor.

_____

Submitted May 7, 2019 – Decided June 10, 2019

Before Judges Hoffman and Geiger.

On appeal from Superior Court of New Jersey, Chancery Division, Family Part, Monmouth County, Docket No. FG-13-0071-17.

Joseph E. Krakora, Public Defender, attorney for appellant (Robyn A. Veasey, Deputy Public Defender,

of counsel; Adrienne Marie Kalosieh, Assistant Deputy Public Defender, on the brief).

Gurbir S. Grewal, Attorney General, attorney for respondent (Melissa H. Raksa, Assistant Attorney General, of counsel; Christina Anne Duclos, Deputy Attorney General, on the brief).

Joseph E. Krakora, Public Defender, Law Guardian, attorney for minor (Margo E.K. Hirsch, Designated Counsel, on the brief).

PER CURIAM

Defendant A.S. appeals from the judgment of guardianship terminating her parental rights to her son, J.L.[1] The child's Law Guardian and the Division of Child Protection and Permanency (the Division) urge us to affirm. Our review of the record shows the factual findings of the trial judge are supported by substantial credible evidence, including his evaluation of witness credibility, and based on those findings, his legal conclusions are correct. We therefore affirm the judgment of guardianship.

I.

Defendant gave birth to J.L. in March 2016. At the time, defendant had already given birth to two other children: C.S., born in 2011, and R.S., born in 2012. Defendant surrendered her parental rights to C.S. in February 2013. At

---

[1] We use initials to protect the parties' privacy.

a later date, Florida Child Protective Services removed R.S. from defendant's care, which ultimately ended with the involuntarily termination or her parental rights to R.S. in Florida.

In January 2016, the Visiting Nurses Association contacted the Division, reporting that defendant was pregnant, had no housing, and had stopped taking her medication for bipolar disorder. Nonetheless, the Division closed the case since the child was not yet born; however, the Division sent a letter to the hospital where defendant planned to deliver, requesting the hospital notify the Division of the child's birth.

Defendant gave birth to J.L. in March 2016. Upon learning of the birth, the Division began its investigation. Defendant confirmed to the Division that she lived in a motel and had no income or benefits, but assured investigators she was prepared to care for the child. She also claimed she felt mentally stable, but would take her medication if recommended. Despite these assurances, the Division conducted an emergency removal of J.L. based on her history with the Division regarding C.S., her prior heroin use, her history of mental health issues, and a previous evaluation which determined defendant lacked the mental capacity to care for a child.

A-0009-18T4

After removal, the Division attempted to provide numerous resources for defendant, including psychological evaluations, parenting classes, transportation assistance, supervised visitation, and assistance with housing and other benefits. Court orders required compliance with the services provided.

Defendant attended a psychological evaluation with Dr. David Brandwein about four months after J.L.'s removal. Dr. Brandwein reviewed defendant's history with the Division and reports from her visits with J.L. He also conducted several tests, such as the Child Abuse Potential Inventory (CAPI), the Millon Clinical Multiaxial Inventory, 4th Edition (MCMI IV), and an IQ test. Dr. Brandwein diagnosed defendant with an intellectual disability which affected her ability to care for herself and others. The CAPI and MCMI IV tests revealed traits Dr. Brandwein described as "very, very concerning," which could lead to maltreatment.

During her evaluation, defendant also disclosed four psychiatric hospitalizations: two for attempted suicides and two for failing to take her medication. She recounted a high level of dependency on men who were unstable, abusive, had substance abuse problems, and criminal histories. Dr. Brandwein recommended the Division no longer provide services to defendant

as he believed the efforts to be futile in correcting her inability to care for a child.

Nonetheless, the Division continued to offer services to defendant. Defendant planned on seeing a psychiatrist, yet she did not resume taking her medications. The Division also referred her to the Mental Health Association (MHA) for help applying for food stamps and disability benefits. The efforts were voided when defendant moved out of the county. She failed to complete any mental health program during the entire period between J.L.'s removal and the guardianship trial. During the same time, she worked only for a short period, first at Dunkin Donuts, before quitting when her training for the job proved "too stressful," and then selling Christmas trees, in 2017.

For a period, defendant lived in a tent in the woods and refused to go to a shelter. At one visit, defendant appeared without a coat or gloves; she made no attempt to find a warm place to stay despite offers of assistance from the Division and MHA. Eventually, defendant stated she planned to move out of state to live with a man she met online; however, she remained in New Jersey.

In August 2017, defendant moved into a motel with L.F., a man she had recently met. After defendant told the Division she would be marrying L.F. and buying a house, L.F. underwent a psychological evaluation. Dr. Brandwein did

not endorse L.F. as an independent caregiver and could "not find feasible any plan by which [L.F.] would supervise [Defendant] with [J.L.]" as he did not know defendant well enough to understand the risks she presented to the child. Further, he feared that should the relationship end, J.L. would be left solely with defendant, which Dr. Brandwein could not endorse.

The Division arranged for supervised visits between J.L. and defendant each week. Defendant did not appear comfortable feeding J.L., burping him, or changing him. One Division worker noted defendant's discomfort and noted defendant "cannot be left alone for even a moment with the baby." Another commented "in 16 [years] of supervising visits [the worker] has never been this uncomfortable and/or worried that a parent could possibly drop the child." Defendant became easily stressed and frustrated during the visits. She showed little interest in her son and his development. She also spent a lot of time on her phone during her visits, rather than focusing on her son. During one visit, defendant hit J.L.'s arm when he did not listen.

The Division recommended parenting skills classes to defendant; however, she did not complete them until February 2018, nearly two years later.

In October 2017, Dr. Brandwein again evaluated defendant. He conducted the same tests as before, with one additional test: the Adult Adolescent Parenting

A-0009-18T4

Inventory, Second Edition. The results showed defendant struggles with parenting stresses, lacks nurturing skills, and lacks empathy, while exhibiting an expectation of strict obedience and a tendency for using the child to meet her own needs. Defendant advised she had not seen a psychiatrist in seven months, had started drinking, and was on and off her medication. She admitted to not having completed any Division services since July 2016.

Dr. Brandwein's ultimate conclusion remained essentially the same as with his prior evaluation. Despite defendant achieving permanent housing with L.F., Dr. Brandwein stated "a roof over one's head does not a safe parent make." He concluded defendant was "one of the most ill-suited candidates for parenting this examiner has ever evaluated. Placing a child back in [her] care would be socially irresponsible" and it would only be "a matter of when, not if, that child would be physically or psychologically harmed."

Dr. Brandwein also conducted a bonding evaluation between J.L. and defendant. J.L. showed minimal desire to interact with defendant, but kept asking for his resource parents, referring to them as "mommy" and "daddy." Defendant and J.L. had no bond, he concluded, and J.L. would experience no harm or grief if the relationship was severed. However, if J.L. were removed

from his resource parents, he would suffer harm in the form of "psychological distress, anxiety, grief, [and] possible reversion in development skills."

At a fact-finding hearing, defendant stipulated to findings that she had abused or neglected J.L. In April and July 2018, the court conducted a trial over the course of three days. In August 2018, the court issued its decision terminating defendant's parental rights.[2] This appeal followed.

On appeal, defendant raises the following arguments:

> I. THE JUDGEMENT OF GUARDIANSHIP SHOULD BE REVERSED BECAUSE DCPP'S EVIDENCE DID NOT SUPPORT THE FOUR PRONGS OF N.J.S.A. 30:4C-15.1(A) TO TERMINATE THE MOTHER'S PARENTAL RIGHTS.
>
> A. REVERSAL IS WARRANTED BECAUSE THE COURT ERRED IN CONCLUDING THAT [DEFENDANT] COULD NOT PROVIDE A SAFE HOME PURSUANT TO PRONG ONE BASED UPON PRIOR INSTABILITY.
>
> B. THE COURT ERRED IN CONCLUDING THAT [DEFENDANT] WAS UNWILLING OR UNABLE TO ALLEVIATE THE HARM TO J.L. WHEN SHE COMPLETED SERVICES PROVIDED AND WAS ALWAYS WILLING TO FOLLOW UP WITH MENTAL HEALTH CARE BUT PREVIOUSLY LACKED THE RESOURCES TO DO SO.
>
> C. THE COURT ERRED IN CONCLUDING THAT DCPP MADE REASONABLE EFFORTS TO

---

[2] J.L.'s birth father voluntarily surrendered his parental rights.

A-0009-18T4

PROVIDE SERVICES TO [DEFENDANT]. AS IT ADMITTED IT DEFERRED TO AN OUTSIDE AGENCY THAT THEN DID NOTHING TO HELP IN THE TWO TASKS NEEDED – SOCIAL SECURITY DISABILITY FOR INCOME AND INSURANCE AND HOUSING.

D. THE COURT ERRED IN CONCLUDING THAT DCPP MET ITS BURDEN TO PROVE TERMINATION OF [DEFENDANT'S] PARENTAL RIGHTS WOULD NOT DO MORE HARM THAN GOOD.

II.

We exercise limited review of a decision terminating a parent's rights. N.J. Div. of Youth & Family Servs. v. M.M., 189 N.J. 261, 278-79 (2007). Factual findings supporting such a judgment "should not be disturbed unless 'they are so wholly insupportable as to result in a denial of justice,' and should be upheld whenever they are 'supported by adequate, substantial[,] and credible evidence.'" In re Guardianship of J.T., 269 N.J. Super. 172, 188 (App. Div. 1993) (quoting Rova Farms Resort, Inc. v. Inv'rs Ins. Co. of Am., 65 N.J. 474, 483-84 (1974)). The Family Part's findings should stand unless "they are so manifestly unsupported by or inconsistent with the competent, relevant[,] and reasonably credible evidence as to offend the interests of justice." Rova Farms Resort, 65 N.J. at 484 (citing Fagliarone v. Twp. of N. Bergen, 78 N.J. Super. 154, 155 (App. Div. 1963)). However, we accord no special deference to the

9

Family judge's interpretation of the law and the legal consequences that flow from established facts. See N.J. Div. of Youth & Family Servs. v. I.S., 202 N.J. 145, 183 (2010).

Defendant argues the Division failed to establish the required elements to succeed in a termination proceeding. To obtain termination of parental rights, the Division must satisfy all four prongs of the following test:

> (1)  The child's safety, health or development has been or will continue to be endangered by the parental relationship;
>
> (2)  The parent is unwilling or unable to eliminate the harm facing the child or is unable or unwilling to provide a safe and stable home for the child and the delay of permanent placement will add to the harm. Such harm may include evidence that separating the child from his resource family parents would cause serious and enduring emotional or psychological harm to the child;
>
> (3)   The Division has made reasonable efforts to provide services to help the parent correct the circumstances which led to the child's placement outside the home and the court has considered alternatives to termination of parental rights; and
>
> (4)  Termination of parental rights will not do more harm than good.
>
> [N.J.S.A. 30:4C:15.1(a).]

These four prongs are neither discrete nor separate, but overlap "to

A-0009-18T4

provide a comprehensive standard that identifies a child's best interests." N.J. Div. of Youth & Family Servs. v. F.M., 211 N.J. 420, 448 (2012) (citing N.J. Div. of Youth & Family Servs. v. G.L., 191 N.J. 596, 606-07 (2007)). "The considerations involved are extremely fact sensitive and require particularized evidence that address[es] the specific circumstance in the given case." N.J. Div. of Youth & Family Servs. v. R.G., 217 N.J. 527, 554 (2014) (alteration in original) (citing N.J. Div. of Youth & Family Servs. v. M.M., 189 N.J. 261, 28 (2007)). The Division must prove by clear and convincing evidence all four statutory prongs. Ibid. We will not overturn a family court's findings unless they were "so wide of the mark that the judge was clearly mistaken." G.L., 191 N.J. at 605.

The first prong of the best interest test requires the judge to determine whether "the child's safety, health, or development has been or will continue to be endangered by the parental relationship." N.J.S.A. 30:4C-15.1(a). The analysis examines the impact of harm caused by the parent-child relationship on the child's health over time. N.J. Div. of Youth & Family Servs. v. P.P., 180 N.J. 494, 506 (2004). The analysis does not "concentrate on a single or isolated harm or past harm" but rather focuses on "the effect of harms" arising over time. In re Guardianship of K.H.O., 161 N.J. 337, 348 (1999). The court is not

concerned only with actual harm to the children, but also with the risk of future harm. In re Guardianship of DMH, 161 N.J. 365, 383 (1999). Further, the harm need not be physical, as emotional or psychological harm may suffice. In re Guardianship of K.L.F., 129 N.J. 32, 44 (1992).

Here, defendant's mental health and instability in terms of job security and housing prior to moving in with L.F. presented a risk. Defendant has not completed any mental health services and has only irregularly taken her medication for bipolar disorder. In fact, she stated she no longer needs medication because she lives with L.F. During her visitations, defendant seemed preoccupied by her phone and showed little interest J.L.; instead, she became easily frustrated with him and even hit him on the arm. Dr. Brandwein opined that placing the child into defendant's care would be socially irresponsible, as it would only be a matter of time before J.L. suffered some form of psychological or physical harm. The record contains substantial support for the trial court's conclusion that the Division satisfied prong one.

Under prong two, the Division must demonstrate "not only that the child's health and development have been and continue to be endangered, but also that the harm is likely to continue because the parent is unable or unwilling to overcome or remove the harm." K.H.O., 161 N.J. at 348. The Division may

satisfy this prong by demonstrating the parent's inability or unwillingness to resolve issues that are detrimental to the child. See N.J. Div of Youth & Family Servs. v. B.G.S., 291 N.J. Super. 582, 592 (App. Div. 1996). This prong determines whether "the parent has cured and overcome the initial harm that endangered the health, safety, or welfare of the child, and is able to continue a parental relationship without recurrent harm to the child." K.H.O., 161 N.J. at 348 (citing In re Guardianship of J.C., 129 N.J. 1, 10 (1992)).

While defendant appears to have found stable housing with L.F., she has not taken appropriate steps to alleviate the other issues surrounding J.L.'s removal. She stopped participating in mandatory therapy in January 2017. She failed to undergo treatment for her mental health disorders, and regularly fails to take her medication, claiming she does not need it any longer. When she received help applying for food stamps, she moved out of the county, voiding the application. Thus, the trial court correctly determined the Division has also satisfied this prong.

Regarding the third prong, the Division must prove it "has made reasonable efforts to provide services to help the parent correct the circumstances which led to the child's placement outside the home and the court has considered alternatives to termination of parental rights." N.J.S.A. 30:4C-

15.1(a). The analysis "contemplates efforts that focus on reunification of the parent with the child and assistance to the parent to correct and overcome those circumstances that necessitated the placement of the child into foster care." K.H.O., 161 N.J. at 354.

The Division placed defendant with the MHA, which offered assistance with mental health services, medication management, and applying for disability and food stamps. Defendant failed to accept assistance in transitioning into stable housing. She also refused the Division's assistance in applying for housing benefits, and instead chose to live in the woods in a tent. The Division also offered psychological treatment and evaluations, which defendant also declined. All of these instances reflect the reasonable efforts the Division made to try and help defendant have J.L. returned to her. Thus, the trial court correctly determined the Division had satisfied this prong.

Lastly, the Division must demonstrate that "termination of parental rights will not do more harm than good." N.J.S.A. 30:4C-15.1(a). The issue "is not whether a biological mother or father is a worthy parent, but whether a child's interest will best be served by completely terminating the child's relationship with that parent." N.J. Div. of Youth & Family Servs. v. E.P., 196 N.J. 88, 108 (2008).

To satisfy this prong of the analysis, the Division must "offer testimony of a 'well-qualified expert who has had full opportunity to make a comprehensive, objective, and informed evaluation' of the child's relationship with both the natural parents and the foster parents." N.J. Div. of Youth & Family Servs. v. A.R., 405 N.J. Super. 418, 442 (App. Div. 2009). The Division "must prove by clear and convincing evidence that separating the child from his or her foster parents would cause serious and enduring emotional or psychological harm." J.C., 129 N.J. at 19.

Here, Dr. Brandwein testified about J.L.'s bonds with both his resource parents and with defendant. He found J.L. had not bonded with defendant at all, but had bonded with the resource family as much as a child his age could. He looked to them for guidance, stability, and safety. As such, Dr. Brandwein concluded J.L. would suffer serious harm if removed from the resource parents, including grief, distress, anxiety, and a potential reversion in his development. Conversely, J.L. would not suffer any harm from severing the relationship with defendant.

Dr. Brandwein found no improvement in defendant, and found her an unfit parent both in the present and in the future, going so far as to state he found her

to be the most unsuitable parent he had evaluated. Accordingly, we conclude the Division provided sufficient evidence to satisfy prong four.

Affirmed.

I hereby certify that the foregoing
is a true copy of the original on
file in my office.

CLERK OF THE APPELLATE DIVISION

A-0009-18T4