# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1222-21

NEW JERSEY DIVISION
OF CHILD PROTECTION
AND PERMANENCY,

     Plaintiff-Respondent,

v.

S.A.,

     Defendant,

and

M.A.,

     Defendant-Appellant.

_____

IN THE MATTER OF THE
GUARDIANSHIP OF M.M.A.,
a minor.

_____

Submitted September 14, 2022 – Decided October 27, 2022

Before Judges Gooden Brown and DeAlmeida.

On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Middlesex County, Docket No. FG-12-0044-21.

Joseph E. Krakora, Public Defender, attorney for appellant (Sarah L. Monaghan, Designated Counsel, on the briefs).

Matthew J. Platkin, Acting Attorney General, attorney for respondent (Melissa H. Raksa, Assistant Attorney General, of counsel; Nicholas Dolinsky, Deputy Attorney General, on the brief).

Joseph E. Krakora, Public Defender, Law Guardian, attorney for minor (Meredith Alexis Pollock, Deputy Public Defender, of counsel; David Valentin, Assistant Deputy Public Defender, of counsel and on the brief).

PER CURIAM

Defendant M.A. (Mark) appeals from the December 3, 2021 amended order of the Family Part terminating his parental rights to his daughter M.M.A. (Marina).[1] We affirm.

I.

Mark and defendant S.A. (Susan) are the biological parents of Marina, who was born in 2016. Five months after Marina's birth, DCPP received a referral alleging that Mark and Susan were using heroin and thereby putting

---

[1] We use initials and pseudonyms to protect the confidentiality of records relating to proceedings involving plaintiff Division of Child Protection and Permanency (DCPP or the Division). R. 1:38-3(d)(12).

Marina's health and safety at risk. At the time, Mark lived with his parents and Susan and the child lived with Susan's father. Mark visited Susan's home often.

During an investigation, Mark admitted he had abused opiates in the past, had recently been arrested for possession of controlled dangerous substances, and was on probation. Susan said she was undergoing methadone treatment to address her addiction to opiates. The Division implemented a safety protection plan (SPP) requiring Mark to be supervised by Susan when he was caring for Marina, due to his recent arrest.

Although Mark quickly enrolled in an intensive outpatient drug abuse treatment program, he overdosed two days later at Susan's home while Marina was present. Susan, who was "panicking," administered Narcan to Mark before paramedics arrived. He was hospitalized as a result of the overdose. Marina was upset and crying during the episode.

The Division changed the SPP to require Mark's mother to be present to supervise visits outside of Susan's home. The Division also filed a complaint seeking care and supervision of Marina, which the court granted.

Because Mark tested negative for illegal substances and was attending treatment for two months, the court granted him unsupervised visits with the child. This was short-lived, however, as Mark was caught tampering with his

A-1222-21

urine sample at his probation office the next day. Supervised visitation was reinstituted.

In February and March 2017, Mark was twice discharged from treatment programs for excessive absenteeism, positive or diluted urine samples, and non-compliance. In June 2017, Susan relapsed on Benzodiazepine, opiates, and cocaine. She later made a voluntary identified surrender of her parental rights to Marina.

The Division, which amended its complaint to obtain custody of Marina, placed the child with Mark's brother (Andrew) and sister-in-law (Vivian). After this placement, Mark was provided supervised visitation with the child. However, he frequently did not attend visits. When he did visit Marina, Mark's interaction and engagement with the child were minimal. When the trial started in September 2021, Mark had not visited the child in person since May 2021 and had only spoken to her for about one minute by telephone in July or August.

Mark regularly failed to attend numerous drug treatment programs offered to him. Although he periodically reengaged with treatment, he repeatedly relapsed, occasionally overdosed, and was hospitalized for drug use. Mark often denied drug use, refused follow-up screenings, and attempted to conceal his abuse of drugs by tampering with urine samples. On one occasion, he tested

positive for cocaine, marijuana, and Xanax. Mark attributed the test results to a "pre-workout drink."

In January 2018, Mark was incarcerated on a probation violation. After his release in February 2018, Mark was arrested on a number of charges, including burglary, automotive theft, and credit card theft. Another period of incarceration followed. Mark's behavior resulted in prolonged absences from Marina's life.

Marina, however, was thriving while living with Andrew and Vivian, and their two sons, who are Marina's cousins. At the time of trial, Marina, who was five, had lived with her aunt, uncle, and cousins for four years. Vivian testified as to her understanding of the difference between kinship legal guardianship (KLG) and adoption and was emphatic that she and Andrew wished to adopt Marina. She stated she was concerned about how Marina would react if removed from her care, recounting that the child threw severe tantrums, tried to climb out of Susan's car, and cried for Andrew and Vivian when overnight visits were attempted after Susan had consistent supervised visits for months. Andrew and Vivian had never denied a request from Mark to visit with Marina or to talk to her on the telephone. But, Vivian testified, Mark did not ask to see or speak to the child often, and when he did their interaction was limited. Vivian testified

5

that Marina had a limited relationship with Mark and that she and Andrew did not want the child exposed to the possibility of Mark seeking custody in the future or the trauma of being separated from the only family she has ever known.

A Division employee confirmed that she discussed KLG with Andrew and Vivian numerous times. She testified that they chose adoption over KLG because of the stability that adoption would provide for Marina.

The court accepted as credible the opinion of an expert in forensic and clinical psychology. The expert testified that during an interview Mark downplayed his parental shortcomings, was glib, and avoided answering questions about his criminal history and substance abuse. Mark acknowledged that Marina was bonded with Andrew and Vivian and said he wanted the child to remain with them while he worked toward reunification. However, Mark presented no plan for reunification or to provide for Marina's care. He stated that regardless of the outcome of the trial, he would continue to be involved in Marina's life because he would see her at family events if she was adopted by Andrew and Vivian. The expert noted that on psychological evaluation tests Mark skipped questions and filled in large swaths of questions with the same answer, indicating avoidance or flippancy and rendering the results invalid.

A-1222-21

The expert opined that Mark's substance abuse disorder, criminal behavior, and lack of concern for Marina's needs, along with his repeated failed attempts at treatment and sobriety, are chronic problems that are unlikely to remediate. He opined that Mark could not safely parent Marina and gave him a poor prognosis for being able to do so in the foreseeable future.

The expert testified that while Marina was familiar with Mark, she scoffed, demeaned, or defied him whenever he attempted to direct her or establish authority over her. Marina also rebuffed Mark's efforts to provide comfort or physical contact. The expert acknowledged a child can form multiple attachments but explained that those attachments come from experience and nurturance and not "out of magic or out of genes or out of biology." The expert opined that Mark meant "nothing" to Marina in terms of nurturance and care and did not look to him as a parental figure. In contrast, Marina displayed a bond and attachment to Andrew and Vivian, who she viewed as her psychological parents and who have been the only stable parental figures in the child's life.

The expert opined that Marina's safety, health, and development had been and would continue to be endangered by her relationship with Mark and that termination of his parental rights would not do more harm than good. He explained Marina would suffer severe and enduring trauma if her placement with

Andrew and Vivian was disrupted or if reunification failed, and there was a risk of Marina being traumatized if she saw Mark under the influence of drugs, overdose, or engage in criminal behavior. The expert opined that Mark lacked the capacity to mitigate this harm and was likely to exacerbate the harm should Marina be forced to attend visits with him.

The record contains no evidence Mark has a realistic plan to provide a stable and nurturing home for his child. For almost all of Marina's life, Mark has not maintained a suitable living environment for her, or provided her with the emotional support and stability necessary for her development and well-being. Mark instead wants Andrew and Vivian to have custody of Marina through KLG so that he might eventually elect to seek custody of the child.[2]

On July 2, 2021, prior to the start of trial, the Governor approved L. 2021, c. 154. The law, which was effective immediately upon enactment, L. 2021, c. 154, § 10, made several amendments to statutory provisions relevant to the appointment of a kinship legal guardian and the standards the Division must meet when petitioning the court for termination of parental rights.

---

[2] Although Mark was present for the first day of trial, he was absent from the second day because he was detained in a county jail and refused to appear. Mark's counsel has informed this court that he presently is serving a prison sentence ending in 2024.

Specifically, the law: (1) sets forth the finding that KLG "is the preferred resource for children who must be removed from their birth parents," L. 2021, c. 154, § 1;[3] (2) amended N.J.S.A. 3B:12A-2 and -5(b)(10) to shorten the period that a child must live with a person for that person to qualify for appointment as a kindship legal guardian, L. 2021, c. 154, §§ 2 and 3; (3) amended N.J.S.A. 3B:12A-6(d)(3) to delete the requirement that adoption of the child is neither feasible nor likely before KLG can be considered, L. 2021, c. 154, § 4; (4) amended N.J.S.A. 9:6-8.30(a), -8.31(b), -8.54(a), and N.J.S.A. 30:4C-12.1(a) to require DCPP to make reasonable efforts to place a child with a person with a kinship relationship prior to placing the child with another person and the court to consider a placement with a person with a kinship relationship prior to placing the child with another person, L. 2021, c. 154, §§ 5, 6, 7 and 8; and (5) amended N.J.S.A. 30:4C-15.1(a)(2), commonly referred to as prong two of the best-interest-of-the-child test, to remove a provision permitting the court to consider evidence that separating the child from their resource family parents would cause serious and enduring emotional or psychological harm to the child, L. 2021, c. 154, § 9.

---

[3] This legislative finding appears as an editor's note to N.J.S.A. 30:4C-83.

The guardianship trial took place on September 24 and October 19, 2021, more than two months after L. 2021, c. 154 took effect. However, during trial, the only mention of the new law was during the closing statement of Mark's counsel. He stated that "as of July 2nd of this year, N.J.S.A. 30:4C-15.1 was amended to reflect that the existence of a healthy bond with the caretakers does not preclude the child from a permanent bond with the parent." This is a reference to a legislative finding in L. 2021, c. 154, § 1. Mark's counsel did not mention any of the substantive statutory amendments effectuated by the new law, particularly the amendment of prong two of the four-prong test set forth in N.J.S.A. 30:4C-15.1(a)(2). The attorneys representing DCPP and the child did not mention the new law.

On November 5, 2021, the trial court issued an oral opinion terminating Mark's parental rights. The court concluded that DCPP had established each prong of N.J.S.A. 30:4C-15.1(a) by clear and convincing evidence. The court found that Mark

> has significant and well-documented parenting limitations, which has further contributed to [Marina] having to remain in resource care and suffer the harm of uncertainty. Specifically, this [c]ourt has found that [DCPP] has proven that [Mark] is unable to adequately parent [Marina] and that his lack of capacity would put [Marina] at risk of harm.

10

> . . . .

> This [c]ourt finds that [DCPP] has proven by clear and convincing evidence that [Mark] has unabated substance abuse issues, lacks appropriate housing, and . . . is incapable of consistent, appropriate, long-term parenting and that [Mark] simply absented himself from [Marina's] life.

The court found that Mark was unwilling or unable to eliminate the harm facing Marina, DCPP made reasonable efforts to provide services to Mark, and the termination of Mark's parental rights would not do more harm than good.

When reaching its decision, however, the court recited N.J.S.A. 30:4C-15.1(a)(2) as if it had not been amended four months earlier. Thus, the court stated that when considering the harm facing Marina "[s]uch harm may include evidence that separating the child from his foster parents would cause serious and enduring emotional and psychological harm to the child." This is a nearly verbatim recitation of the language removed from N.J.S.A. 30:4C-15.1(a)(2) by L. 2021, c. 154, § 9 on July 2, 2021. When analyzing factor two, the court found that Marina "has established a safe and secure bond with the resource parents, who wish to adopt her, and the severance of those bonds will cause severe harm."

The court did not mention the provisions of L. 2021, c. 154 declaring KLG to be a preference over adoption or the other statutory amendments favoring KLG. Instead, the court stated that "[a]s public policy increasingly focuses on

11

a child's need for permanency, the emphasis has shifted [from] protracted efforts for reunification with the birth parents to an expeditious and permanent placement to promote the child's well[-]being." The court's description of the trend in public policy with respect to permanency is not in sync with the statutory amendments enacted in L. 2021, c. 154.

On December 3, 2021, the trial court issued a supplemental oral opinion, the entirety of which follows:

> This – this is a supplemental decision, as I said. Now this [c]ourt relies upon the previous decision, which was it (sic) entered into this case. However, the prior decision did not address – excuse me – the change in N.J.S.A. 30:4C-15.1, which was amended at [s]ubsection (a)(2), which is the second prong. Excuse me. The amendment removed the second sentence, which reads quote: "Such harm may include evidence that separating the child from his resource family parents would cause serious and enduring emotional or psychological harm to the child," unquote.
>
> In the instant matter, the testimony and evidence were replete with information that the defendant's parental rights should be terminated even when the amendment is considered by the [c]ourt. Evidence was produced by the State which was clear and convincing that the parental rights should be terminated. The defendant's criminal activity, lack of a plan, and unstable housing all point to sufficient reasons by clear and convincing evidence even without the previous language contained in the second prong.

Based upon all that was heard during the trial, this [c]ourt reaffirms its decision to terminate the parental rights of the defendant.

On December 3, 2021, the trial court entered an amended order terminating Mark's parental rights to Marina. The body of the order is dated November 5, 2021 and states that the court issued its decision on November 5, 2021. However, the order was filed on December 3, 2021 and states that the matter was brought before the court on that date. The December 3, 2021 supplemental decision is not noted in the order.

This appeal follows. Mark argues: (1) the court erred with respect to prong three of the statutory analysis, N.J.S.A. 30:4C-15.1(a)(3), because it did not consider KLG as an alternative to termination; (2) the record does not support the trial court's conclusion that termination of Mark's parental rights would not cause more harm than good under prong four of the analysis, N.J.S.A. 30:4C-15.1(a)(4); and (3) the order terminating his parental rights was the result of ineffective assistance of his trial counsel.

II.

Our scope of review on appeal from an order terminating parental rights is limited. N.J. Div. of Youth & Fam. Servs. v. G.L., 191 N.J. 596, 605 (2007). We will uphold a trial judge's factfindings if they are "supported by adequate,

13

substantial, and credible evidence." N.J. Div. of Youth & Fam. Servs. v. R.G., 217 N.J. 527, 552 (2014). "We accord deference to factfindings of the family court because it has the superior ability to gauge the credibility of the witnesses who testify before it and because it possesses special expertise in matters related to the family." N.J. Div. of Youth & Fam. Servs. v. F.M., 211 N.J. 420, 448 (2012); see Cesare v. Cesare, 154 N.J. 394, 413 (1998). "Only when the trial court's conclusions are so 'clearly mistaken' or 'wide of the mark' should an appellate court intervene and make its own findings to ensure that there is not a denial of justice." N.J. Div. of Youth & Fam. Servs. v. E.P., 196 N.J. 88, 104 (2008) (quoting G.L., 191 N.J. at 605). We also accord deference to the judge's credibility determinations "based upon his or her opportunity to see and hear the witnesses." N.J. Div. of Youth & Fam. Servs. v. R.L., 388 N.J. Super. 81, 88 (App. Div. 2006). No deference is given to the court's "interpretation of the law" which is reviewed de novo. D.W. v. R.W., 212 N.J. 232, 245-46 (2012).

When terminating parental rights, the court focuses on the "best interests of the child standard" and may grant a petition when the four prongs set forth in N.J.S.A. 30:4C-15.1(a) are established by clear and convincing evidence. In re Guardianship of K.H.O., 161 N.J. 337, 347-48 (1999). "The four criteria enumerated in the best interests standard are not discrete and separate; they

14

relate to and overlap with one another to provide a comprehensive standard that identifies a child's best interests." Id. at 348.

N.J.S.A. 30:4C-15.1(a), as amended by L. 2021, c. 154, requires the Division to prove:

> (1) The child's safety, health, or development has been or will continue to be endangered by the parental relationship;
>
> (2) The parent is unwilling or unable to eliminate the harm facing the child or is unable or unwilling to provide a safe and stable home for the child and the delay of permanent placement will add to the harm;
>
> (3) The division has made reasonable efforts to provide services to help the parent correct the circumstances which led to the child's placement outside the home and the court has considered alternatives to termination of parental rights; and
>
> (4) Termination of parental rights will not do more harm than good.

We begin our analysis by acknowledging that the trial court made a legal error when, in its November 5, 2021 opinion, it analyzed the Division's application for termination of Mark's parental rights under a version of N.J.S.A. 30:4C-15.1(a) that had been substantively amended four months earlier. As explained above, a provision of N.J.S.A. 30:4C-15.1(a)(2) allowing the court to consider the harm that would be visited on Marina were she separated from

Andrew and Vivian was removed by L. 2021, c. 154, § 9.  Yet, the trial court quoted the deleted provision and appears to have considered that harm in its analysis.[4]

On December 3, 2021, the trial court addressed its error in a supplemental opinion.  While the supplemental opinion is brief, having carefully reviewed the record, we are confident the trial court ultimately relied on the amended version of N.J.S.A. 30:4C-15.1(a)(2) when it entered the December 3, 2021 order terminating Mark's parental rights to Marina.  Mark argues that the trial court's failure to note the December 3, 2021 supplemental opinion in its December 3, 2021 order is indicative of the court's reliance on the outdated version of N.J.S.A. 30:4C-15.1(a)(2).  See Rule 1:6-2 (f) ("If the court has made findings of fact and conclusions of law . . . the order shall indicate whether the findings

---

[4] We need not tarry long on the cause of the trial court's error.  At trial, Mark's counsel expressed his awareness of L. 2021, c. 154, although he informed the court of only one of its provisions, which was of limited assistance to his client's position.  The attorneys representing DCPP and Marina did not mention the new law.  When the trial court issued its November 5, 2021 opinion, some four months after enactment of L. 2021, c. 154, counsel for all parties were present.  None objected to the court's application of the outdated version of N.J.S.A. 30:4C-15.1(a).  Although there is no indication in the record that any party moved for reconsideration pursuant to Rule 4:49-2, the court apparently became aware of its error, triggering issuance of its December 3, 2021 opinion.  We note only that it is incumbent on counsel and the court to remain apprised of the enactment of new statutes.  See State v. O'Neil, 219 N.J. 598, 616-17 (2015).

and conclusion were written or oral and the date on which they were rendered."). We view the omission as an immaterial oversight.

Mark argues that the trial court erred when it concluded the Division had established prong three of the statutory test, N.J.S.A. 30:4C-15.1(a)(3), because it failed to consider KLG as an obvious alternative to termination. We disagree. The record establishes that DCPP first placed the child with Andrew and Vivian, who both have a kinship relationship with Marina, N.J.S.A. 3B:12A-1, and would, after the statutory period of caring for the child, have been eligible for KLG. N.J.S.A. 3B:12A-5(b). A Division employee explained to Andrew and Vivian the differences between KLG and adoption on numerous occasions. The couple was not interested in pursuing KLG. As Vivian clearly explained at trial, she and Andrew, while open to allowing Mark to have contact with the child, do not want Marina to live with the possibility of Mark one day seeking custody and disrupting the only stable home she has known.

There is nothing in the record suggesting that KLG was a viable alternative for Marina. Mark has identified no person with a kinship relationship to Marina who wishes to accept KLG of the child. And, we see no provision of L. 2021, c. 154 that would permit a court to compel Andrew and Vivian to accept KLG against their wishes. The intent of L. 2021, c. 154 was satisfied here: the

17

Division placed the child with kin immediately upon gaining custody and it explored KLG with the only two relatives who stepped forward to care for the child. They rejected KLG, offering instead to adopt the child. The outcome placed Marina in a permanent home with her uncle, aunt, and cousins. Her adoptive parents have promoted frequent contact between Marina and many of her other relatives, including Mark's parents, none of whom have offered to accept custody of the child under KLG. It is difficult to see this outcome as contrary to the intent of L. 2021, c. 154, which includes the legislative finding that "[t]here are many benefits to placing children with relatives . . . such as increased stability and safety as well as the ability to maintain family connections and cultural traditions." L. 2021, c. 154, § 1.

We are also not persuaded by Mark's argument that there is insufficient evidence in the record for the trial court's conclusion that the termination of his parental rights would not cause more harm than good. Termination of parental rights poses a risk to children due to the severing of the relationship with their natural parents, but it is based "on the paramount need the children have for permanent and defined parent-child relationships." K.H.O., 161 N.J. at 355 (quoting In re Guardianship of J.C., 129 N.J. 1, 26 (1992)).

Thus, "the fourth prong of the best interests standard [does not] require a showing that no harm will befall the child as a result of the severing of biological ties." K.H.O., 161 N.J. at 355. Prong four "serves as a fail-safe against termination even where the remaining standards have been met." G.L., 191 N.J. at 609. Generally, to prove the fourth prong, DCPP "should offer testimony of a well[-]qualified expert who has had full opportunity to make a comprehensive, objective, and informed evaluation of the child's relationship with both the natural parents and the foster parents." F.M., 211 N.J. at 453 (quoting N.J. Div. of Youth & Fam. Servs. v. M.M., 189 N.J. 261, 281 (2007)); See R.G., 217 N.J. at 564 (finding the Division's position lacked support because "no bonding evaluation was conducted"); N.J. Div. of Youth & Fam. Servs. v. A.R., 405 N.J. Super. 418, 432 (App. Div. 2009) (affirming an order denying the termination of parental rights where no bonding evaluation was conducted).

Here, the trial court relied on expert testimony that Mark has not provided Marina with a stable and nurturing home. He has not provided for her well-being. Marina's relationship to Mark, apart from biology, is minimal. She does not view him as a parental figure. The harm to Marina from the termination of Mark's parental rights would be minimal. On the other hand, termination will result in a significant benefit for the child, she will be freed for adoption by her

19

uncle and aunt, who have provided her with a safe home since shortly after her birth and have maintained her contact with her paternal relatives.

Lastly, we turn to Mark's claim that he was denied the effective assistance of counsel. In N.J. Div. of Youth and Fam. Servs. v. B.R., 192 N.J. 301, 306-07 (2007), the Court held that a parent facing termination of parental rights is entitled to effective assistance of counsel. In order to establish a prima facie case of ineffective assistance, a parent must demonstrate that trial counsel's performance was deficient, and that there exists "'a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'" Id. at 307 (quoting Strickland v. Washington, 466 U.S. 668, 694 (1984)). Our review of ineffective assistance of counsel claims is "highly deferential" Ibid. (quoting Strickland, 466 U.S. at 689). We presume counsel's performance fell within acceptable standards governing attorneys in like circumstances absent proof to the contrary.

We agree that Mark's trial counsel fell below acceptable standards when he failed to inform the court of the substantive provisions of L. 2021, c. 154 during trial and when the court issued its November 5, 2021 opinion. He also should have moved for reconsideration after the court issued its original opinion. In addition, Mark's counsel failed to object during trial to evidence relating to

the harm that would be visited on Marina were her relationship with Andrew and Vivian severed and did not question witnesses with respect to whether the newly enacted statute's standards were considered by DCPP prior to the start of trial.

However, as we have explained above, the trial court ultimately decided DCPP's application to terminate Mark's parental rights under the amended version of N.J.S.A. 30:4C-15.1(a), and, given the absence of a qualified person to accept custody of Marina under KLG, counsel's failure to raise the issue with the court would not have changed the outcome of this matter.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

21